William Bruggeman, Appellant, v. The Illinois Central Railroad Company, Appellee.

**Evidence:** INVASION OF PROVINCE OF JURY. Interrogatories calling for the very matters which it is the province of the jury to determine should be denied; as where the engineer of a train was asked whether he could by any possibility have stopped the train in a shorter distance, and whether it could have been stopped by any human agency in a shorter distance, as this was a vital issue in the case.

**Evidence:** ADMISSIBILITY OF DOCUMENTARY EVIDENCE. Books upon the subject of air brakes, purporting to give the distance at which trains moving at different rates of speed can be stopped by an application of the brakes, are not admissible in evidence to show such facts because not relating to any exact science; and further, because not revealing the conditions under which the tests were made: And aside from such objections the question of admissibility is within the sound discretion of the court.

**Evidence:** HYPOTHETICAL QUESTIONS: PREJUDICIAL REMARKS OF COURT. Where the evidence was sufficient to support a hypothetical question it was error for the court to remark in the presence of the jury that the testimony did not show certain facts assumed in the question.

**Railways:** CROSSING ACCIDENT: SIGNALS: NEGLIGENCE: INSTRUCTION. The statute requiring a sounding of the engine whistle and ringing of the bell on approaching a highway crossing, while not applicable to street crossings within the limits of cities or towns, so far as sounding the whistle is concerned, does apply in both respects when the train is approaching a crossing within an unincorporated village; so that where a crossing accident happens in an unincorporated village, and one of the grounds of negligence alleged is failure to give the statutory signals on approaching the crossing, the jury should be fully instructed with relation to the statutory signals.

**Same:** CROSSING SIGNALS: RATE OF SPEED: INSTRUCTION. In an action for the negligent operation of a train over a highway crossing, grounded both upon failure to give statutory signals and excessive rate of speed, an instruction that the speed of the train would not of itself constitute negligence but might be considered in determ-

mining whether reasonable and adequate signals were given, together with the other proven facts bearing on that issue, was insufficient, because presenting but one side of the question; since it eliminated consideration of speed as a ground of negligence, except as bearing upon defendant's negligent failure to give adequate signals.

**Same.** Where excessive speed is made a ground of negligence in approaching a highway crossing and the evidence supports the issue, an instruction confining the jury's consideration to defendant's alleged negligence in failing to give adequate signals is erroneous.

**Same:** CONTRIBUTORY NEGLIGENCE. An instruction requiring plaintiff in a personal injury action, as a condition precedent to recovery, to show himself absolutely free from all negligence is erroneous, because requiring too great a degree of care on his part.

**Same:** DUTY TO STOP, LOOK AND LISTEN: DEGREE OF CARE REQUIRED. The rule requiring one approaching a railway crossing to stop, look and listen for an approaching train exacts of him reasonable care in so doing; and an instruction that it was plaintiff's duty to use ordinary care under all the circumstances to stop, look and listen at such reasonable places as would best enable him to discover an approaching train was erroneous, because requiring of him an exercise of the highest degree of care in selecting the best places for observation, instead of ordinary care. And an instruction that if plaintiff could have seen the train in time to have avoided the accident by an exercise of ordinary care, and did not do so, was erroneous; as plaintiff was not necessarily negligent because the danger might have been seen and avoided.

**Same:** LAST CLEAR CHANCE: INSTRUCTION. It is not essential to an application of the doctrine of the last clear chance that plaintiff's negligence should have ceased before the accident, in order to recover under that doctrine: So that even though the plaintiff, in a personal injury action, was negligent in putting himself in a place of danger and in remaining there down to the very time of the accident, still, if the defendant knew of plaintiff's danger in time to have avoided the injury by exercising reasonable care, it would be liable for failure to exercise such care under the doctrine of the last clear chance. The instruction in this case fails to correctly state the rule.

**Same:** EVIDENCE. Under the evidence in this action for injury at a railway crossing it is held, that the question of whether defendant might not have prevented the accident was for the jury, although

plaintiff's negligence in going upon the crossing continued up to the very time of the accident.

**Railways:** CROSSINGS: CONTRIBUTORY NEGLIGENCE. If a traveler approaching a railway crossing sees a train at such distance that he believes he can safely cross in the exercise of ordinary care, he is not negligent in attempting to cross, although unable to pass over the track before he is struck by the train.

**Same.** One who is confronted with a sudden peril is not necessarily negligent in taking the more dangerous of two or more avenues of escape.

Evans, C. J., dissenting in part.

*Appeal from Mitchell District Court.*—Hon. J. F. Clyde, Judge.

Monday, December 20, 1909.

Rehearing Denied, Tuesday, April 12, 1910.

Action at law to recover damages for injuries received by plaintiff in a collision with one of defendant's trains at a public highway crossing in the town of Toeterville, in Mitchell County. The case was tried to a jury, resulting in a verdict and judgment for the defendant, and plaintiff appeals.—*Reversed* and *remanded.*

*Charles E. Salisbury, William H. Salisbury,* and *Miles K. Culver,* for appellant.

*Kenyon, Kelleher & O'Conner* and *Ellis & Ellis,* for appellee.

Deemer, J.—That plaintiff received the injuries of which he complains by reason of being struck by a train on defendant's line of road, at a public highway crossing at the town of Toeterville, is conceded. But defendant denies any negligence on its part, and claims that plaintiff was

guilty of negligence contributing to his injury, and that he can not recover. That there was enough testimony to take the question of defendant's negligence to the jury is practically conceded; but it is contended that, as a matter of law, plaintiff was guilty of contributory negligence, and that, no matter what the errors of the trial court, the judgment should be affirmed on that ground. Plaintiff's counsel have exhausted the alphabet in arguing errors, and in addition thereto have used so many numerals that we have not attempted to count them. At the conclusion of their argument they summarize these alleged errors under thirty-seven different heads, and we shall not go beyond this summary in trying to formulate an opinion which will settle the material and controlling points in the case. In view of the conclusion reached it will not be necessary to pass upon many of the propositions argued.

Defendant's railway runs east and west through the town of Toeterville, and there were two switches in the village, known as the east and west switches. A public highway running north and south crosses the right of way. The west switch is something like eight hundred and ninety-two feet from the point where the highway crosses the main line, and the east switch is about three hundred and seventy-two feet distant therefrom. There are stockyards near the west switch something like five hundred and thirty-four feet from the highway crossing. Westward of the highway crossing about three hundred and thirty-eight feet are some coal sheds, and also an elevator about two hundred feet west of the crossing. These buildings and yards are all north of the railroad track and west of the highway crossing. The railway depot is south of the track, and about fifty-seven feet west of the crossing. At the highway crossing there are two tracks, one known as the main line, and the other as the passing track, and the distance between the inside rails of these tracks is something like eight feet and ten inches. At the time of the accident

in question there were some box cars on the passing track extending from the elevator to the stockyards, although as to this there is some dispute in the testimony.

There is an angling road, which leads from the stockyards in a gentle curve along north of the elevator and north of the passing track, and gradually nearing said passing track, and at the point where the highway crosses the passing track joins with this highway and crosses the passing track and the main track. This angling road is the road used by persons having business at the stockyards, who afterwards drive over into the village of Toeterville to make purchases and transact business. The main part of the village of Toeterville is south of the railroad tracks; the only business conducted north of the track being the stockyard business and the lumber yard business. The lumber yards are situated to the east of the north and south highway, a few feet north of the passing track, and being a few feet from the highway. The lumber in the yards was not in sheds on December 1, 1906, but was put in piles north of the lumber office, and had lanes running east and west. These piles were in places high. There is a whistle post west from the center of the public highway, and the distance of the whistle post from the place where the appellant was injured in the center of said highway is two thousand seven hundred and ninety-three feet nine inches.

Plaintiff is a young farmer thirty-four years of age, and "on December 1, 1906, at from about two o'clock to two thirty o'clock p. m., he and his father started to take a load of hogs to Toeterville. The roads were rather rough, and they drove slowly. Appellant and his father, after reaching Toeterville, drove to the stockyards, unloaded the hogs, and weighed them. They then drove slowly from the stockyards on the angling road leading by the north side of the elevator and inclining gently toward the passing track, with the intention of passing over the tracks by way of the public highway and going over into the main part of the village of Toeterville to transact business. There was a train due at the station, coming

from the west at two thirty-four p. m., but the testimony
shows that it was late, some of it indicating that it did
not arrive there on the day in question until after three
o'clock. The testimony also shows that this train went to
the little town of Stacyville, where it was turned around
and immediately brought back from the east over the same
track. The time taken to go to Stacyville and back was
about half an hour. Appellant, with his father by his side
seated in a broad-tired lumber wagon, with a hog rack on,
and driving a pair of horses, one of which was eighteen
and the other twelve years of age, proceeded toward the
place where the angling road joins with the highway where
it crosses the railroad in the village of Toeterville. Ac-
cording to plaintiff's testimony, when the horses approached
the side track or passing track north of the main track,
and just before the side track was reached, he looked west
along the track to note whether there was a train coming.
This glance was in the direction of the elevator. . . . .
When the appellant looked west toward the elevator to note
whether there was a train coming, he said he could see
none. His team at this time was, as he says, about up to
or just going on the side track. He said: 'I didn't see
anything, so I looked to the east, because I had an idea
that if there was a train coming it would be from Stacy-
ville.' " Quoting now from his testimony: "I knew
about the time trains were due from Stacyville—about
three six in the afternoon. My opinion is that this time
when I looked must have been about three o'clock. In
coming up to the track I listened to know whether there
was any signal or anything of the kind. I didn't hear
any." Witness further says:

I heard a short whistle, and looked back. This was
when my horses were stamping the main track. I think
they were just with the front feet on the main track.
I was sitting on the right side of the wagon and wore a
hat which the wind kind of flapped over my face on the side

toward the elevator. The wind was blowing south. When I heard those sharp whistles, I hollered to my team to jump, but they didn't, so I swung them off to the left. The train came so fast that I couldn't get them off in time. The engine caught the right horse under the front legs and threw her up, and that swung the wagon, and the tender caught the wagon on the hind part and smashed that up, and the next thing I knew I had been falling down. As near as I can say I fell down beside the last coach, and when I was lying there the last coach was by. I was lying right on my back, and lifted up my leg and saw my foot was cut off. After I heard that whistle, I looked toward the engine. That was the first I had seen or heard of the train. They were coming pretty fast. If they didn't come so fast I pretty sure I got off the track. The last coach and last truck must have cut my leg off. The train had gone quite a ways before it stopped after it had hit me.

Other witnesses corroborated plaintiff to some extent:

The train which struck him was made up as follows: Engine, mail car, baggage car, smoking car, and ladies car, four coaches, and the tender and engine. The engine weighs about forty tons, and the cars about twenty tons apiece. The train was equipped with the Westinghouse air brake system, and had the quick action triple valve. The train was equipped with four-wheeled trucks, there being two under each coach, making eight wheels under each coach, and there was a brake bearing on each wheel. There were four bearing places for brakes on the engine, and there were eight wheels with a brake to each wheel on the tender. The length of the engine and tender was sixty feet. The length of each coach on the train was between fifty and sixty feet. The engineer and fireman both agree that the train was proceeding at a speed of about thirty or thirty-five miles per hour. Other witnesses claim that the train did not slacken before it hit the appellant. When the train hit the appellant, the horses and wagon were thrown some distance. One witness says one horse was thrown from six to eight rods. It is shown that the train whistled once for the crossing when out at the whistling post, which was two thousand seven hundred and ninety-

three feet nine inches away from the crossing. No other whistle was given until the emergency whistle was sounded, which was somewhere between two hundred and fifty and five hundred feet from the crossing. The engineer and the fireman testify that the bell was ringing. The witnesses of the appellant testify that the bell was not ringing, and that, though in a position to hear it, they did not hear it. The employees of the appellee claim that they made every effort to stop the train after it became evident to them that the appellant could not or would not get off the track. Claim is made by these employees that they first saw the appellant as they approached the elevator. German, the fireman, said: 'As we approached the elevator, I saw the team approaching the side track from the north, and warned the engineer. About the same time he noticed it himself, and grabbed the whistle rope.' Witness further stated: 'I first saw Will Bruggeman on that crossing that day when the team was approaching the side track. I could see Mr. Bruggeman from where he was at the time when I first saw the team.' 'I could see him, and the team, too, from the very first. I was looking straight ahead to the east down the track, and my attention was not attracted to this team until they had started, just before they got onto the side track, perhaps five or six feet before they reached the side track. Then my attention was called, and I warned the engineer. I was very near the east side of the elevator. The whole rig was visible.' The engineer stated: 'When the engine got opposite the elevator, I observed this team coming upon the side track north of the main track. I immediately grabbed the whistle, and gave several sharp blasts of the whistle. I jerked the rope successively—short blasts. I should say a second between each jerk or pull of the rope would be necessary in order to give sharp blasts of the whistle, and not give one continuous blast. The fact is, it is necessary to give a second between each jerk to make a clear, short blast, or about that. I whistled for the town just as we left the whistle post.' In answering the question, 'How many blasts of the whistle did you give?' he said, 'One long blast.'

The testimony as to the space within which the

train could have been stopped is conflicting; some of the witnesses said in from two hundred and forty to two hundred and fifty feet, and others that it could not be stopped short of four hundred and fifty to five hundred feet. With this testimony before us we now go to some of the errors complained of.

The negligence charged in the petition was (1) excessive speed of the train; (2) failure to sound the whistle and ring the bell as the train went through the town; (3) failure to sound the whistle and ring the bell as required by law before approaching the crossing, where plaintiff was injured; (4) the leaving of cars upon the side track in such a manner as to obstruct plaintiff's view of the train when approaching the highway crossing; and, (5) seeing plaintiff upon the track and in a position of peril in time to have saved him, the engineer in charge of the train failed to check or take the usual precautions to avoid injuring him.

Many complaints are made of the conduct of the court and of opposing counsel, and an argument of nearly twenty printed pages is devoted to these matters. We shall not take up these complaints in detail. It is sufficient to say the trial was not conducted with that decorum which should have been observed. Many things were said and done by counsel on either side which should not have been permitted, and it seems that the patience of the trial court was severely taxed. Remarks were made by counsel which necessarily called for a rebuke from the court, and it is doubtless true that, as viewed from the cold printed page, the court went to the very verge of propriety in some of its remarks. They were induced, however, by the conduct of counsel toward each other and toward the court, and we shall not reverse for that ground. Upon a retrial of the cause it will be well for counsel on either side to more closely observe the rules which should always govern their

conduct, even in the trial of a protracted and vigorously contested law suit.

Whilst many questions are presented with reference to rulings on testimony, we shall consider but three or four. The engineer of the train was a witness for the defendant, and questions were propounded to him which were objected to as shown. Rulings of the court are also given, as well as the answers of the witness: "Q. Taking this train as you was operating that day, applied and constructed as it was, on the track at Toeterville, where you were then running and operating this train, could you have stopped this train by any possibility in any shorter distance than the train was in fact stopped? (Plaintiff objects as calling for a conclusion of the witness. Objection overruled. Plaintiff excepts.) A. No, sir; I could not. Q. Could it have been stopped by any human agency in any quicker time on that particular day than it was stopped then? (Plaintiff objects as calling for a conclusion.) Q. In your opinion? (Objection overruled. Plaintiff excepts.) A. No, sir." As these questions called for the very matters which the jury was to determine, rather than answers to hypothetical questions, or as to the time in which such a train might have been stopped, the court was in error in overruling the objections. This is squarely held in *Nosler v. Railroad*, 73 Iowa, 268. See, also, as sustaining the same proposition, 8 Ency. of Pleading & Practice, 751, and cases cited, including the following from Iowa: *Whitsett v. Ry. Co.*, 67 Iowa, 150; *Kitteringham v. Ry. Co.*, 62 Iowa, 285; *Smith v. Hickenbottom*, 57 Iowa, 733; *Allen v. Ry. Co.*, 57 Iowa, 623; *Muldowney v. Ry. Co.*, 39 Iowa, 622; *State v. Felter*, 25 Iowa, 67. The distinction between questions which do not usurp the functions of the jury and those which do is pointed out in *Sachra v. Town of Manilla*, 120 Iowa, 562.

II. Plaintiff introduced in evidence certain printed

1. EVIDENCE: invasion of province of jury.

books on air brakes and air brake proceedings, purporting
to give the distance in which trains moving at. different

2. EVIDENCE: ad-   rates of speed could be stopped.   These were
missibility of
documentary   based upon facts given under conditions not
evidence.   stated, or, if stated, were not shown to be
similar to those existing at or near the place where the
collision occurred in the instant case.   For many reasons
these books were not admissible in evidence.   In the first
place they did not relate to any of the exact sciences;
again the conditions under which the tests were made are
not shown; and, lastly, the matter was, in any event, with-
in the sound discretion of the trial court.   *Bixby v. R.
R. Co.,* 105 Iowa, 293; *Etzkorn v. Oelwein,* 142 Iowa, 107;
*Kimball v. Electric Co.,* 141 Iowa, 632.

III.   Plaintiff called an engineer, who was qualified as
an expert, and propounded to him the following question:
"Q.. Mr. Kerney, I call your attention to that Toeterville

3. EVIDENCE:   track.  Suppose the day was clear; the track
hypothetical
questions:   was dry; there was a little dust in the air,
prejudicial
remarks of   and the wind was blowing either from the
court.   southeast or southwest, and suppose that a
train consisting of a forty-ton engine and four coaches,
each weighing about twenty tons, baggage and tender and
all, equipped with the Westinghouse brakes, with the
quick action triple—suppose that train was proceeding at
from twenty-five to twenty-six miles per hour, and suppose
that an obstruction was discovered on the highway where
it crosses the railroad track, at a distance varying from
two hundred and two to two hundred and sixty-eight feet,
could that train be stopped before it reached that crossing
by application of the brakes with which the train was
equipped as stated?"   Defendant objected to the com-
petency of the witness, and also upon the ground that it
embodied matter not shown by the record.   The trial court
then made following record:   "Court:  In what respect do
you claim, Mr. Ellis, that the hypothesis is incorrect or

not sustained by the record? Mr. Ellis: I claim that there is no evidence here as to when this party was discovered by the engineer upon the train. The basis on which this question is asked formulates a certain number of feet, which is not shown to be correct, and there is nothing to show that it became in any way the duty of the engineer to stop the train at the place designated in this question. Court: Well, I think this objection should be sustained, particularly on two grounds: First, that it is not yet shown that this witness has ever handled a train substantially like this; and second, the hypothesis assumes that the party was seen on the track at a distance from two hundred and two to two hundred and sixty feet. The evidence does not show that fact. Under the testimony here he wasn't on the main track at that time. Mr. W. H. Salisbury: Your honor, the witness' horses were upon the track by the evidence when the emergency whistle was sounded. Mr. Ellis: There is no such evidence. Court: The court does not remember the testimony. Plaintiff excepts." There was sufficient testimony in the record to justify the hypothetical question, and the trial court was in error in making the ruling, and more especially in remarking before the jury that the testimony did not show certain of the assumed facts. *State v. Philpot,* 97 Iowa, 365; *Russ v. Steamboat,* 9 Iowa, 374; *In re Knox Will,* 123 Iowa, 24; *Shakman v. Potter,* 98 Iowa, 61; *Coldren v. Le Gore,* 118 Iowa, 212. These are all the rulings on evidence which we shall consider, as other objections are either without merit, or the matter will not arise upon another trial.

IV. Coming now to the instructions, it may be said in general that they are not as clear as they should have been in presenting the exact issues to the jury. Plaintiff was relying, not only upon defendant's failure to give the statutory signals for a highway crossing, but also upon the engineer's failure to give any kind of a warning signal

in approaching the crossing in question, in view of the
condition of affairs with reference to build-
ings, stock yards, lumber yards, etc., as shown
by the record. The trial court submitted this
with reference to signals: "1. That reason-
able and adequate signals were not given of the approach
of the train to the crossing in question"—and then said:
"Other allegations made by plaintiff are withdrawn by the
court, and need not be considered by you." It will be ob-
served that nothing is said here about statutory signals.
This instruction was followed by one numbered 4, read-
ing as follows:

4. RAILWAYS:
crossing acci-
dent: signals:
negligence:
instruction.

In the matter of signals our statute provides that 'the
whistle shall be twice sharply sounded at least sixty rods
before a road crossing is reached and after the sounding
of the whistle the bell shall be rung continuously until
the crossing is passed.' Our Supreme Court have held
that a failure to give these statutory signals would consti-
tute negligence, but that if the crossing approached was
more than usually dangerous because of curves or cuts or
obstructions, more than the statutory signals might be
found by the jury to be necessary for reasonable and ade-
quate warning of the approach of the train to the crossing.
It was the duty of the defendant's employees in charge of
the train in question to give reasonable and adequate
warning of the approach of the train to the crossing, to be
determined by the jury from the dangers to be reasonably
apprehended at the crossing. If defendant's employees did
not use ordinary care to give reasonable and adequate warn-
ing of the approach of the train to the crossing in ques-
tion, as herein stated, then they were negligent in that re-
spect. If they used ordinary care in giving such warning,
they were not negligent in that respect. Care, to be reason-
able, must be in proportion to the danger to be apprehended.
On this issue the defendant's employees had the right to
assume that all persons approaching or attempting to cross
the crossing would exercise reasonable and ordinary cau-
tion for their own safety, bearing in mind the dangers to
be apprehended at the crossing.

Taking these instructions together, it is very difficult to say whether or not the jury was permitted to consider defendant's failure to give the statutory signals as evidence of negligence. It is provided by section 2072 of the Code: "A bell and a steam whistle shall be placed on each locomotive engine operated on any railway, which whistle shall be twice sharply sounded at least sixty rods before a road crossing is reached, and after the sounding of the whistle the bell shall. be rung continously until the crossing is passed; but at street crossings within the limits of cities or towns the sounding of the whistle may be omitted, unless required by ordinance or resolution of the council thereof; and the company shall be liable for all damages which shall be sustained by any person by reason of such neglect. . . ." As Toeterville is neither a city nor town, but a mere village, this section seems to be applicable to the case, and the court should have so instructed the jury, and not left it so uncertain as it did. *Potter v. R. R. Co.,* 46 Iowa, 399; *McGuire v. R. R. Co.,* 138 Iowa, 664.

V. In its fifth instruction the court said: "Our statute does not fix any limit to the speed at which trains shall be run, even at highway crossings. In this case the speed at which the train in question was run at the crossing or approaching thereto—whether great or little—would not of itself constitute negligence, but you have the right to consider that speed in deciding whether or not reasonable and adequate signals were given, together with all the proven facts bearing on that issue." This evidently presented but one side of the question. Indeed, if the jury followed it, they were obliged to find, under the facts of the case as disclosed by the testimony, that the speed of the train could not be considered as showing negligence on the part of the defendant, save as it had bearing only upon the question of defendant's neglect to give reasonable and adequate signals.

5. SAME: crossing signals: rate of speed: instruction.

We have recently had occasion to consider the question of speed in *Hartman v. R. R. Co.*, 132 Iowa, 582, and we there said: "The plaintiff also alleges negligence in the speed of the train at the time of the collision. As has often been said, no rate of speed in a train moving in the open country is in itself negligence as to a person upon a crossing, but it sometimes happens, when considered with reference to the circumstances of the particular place, that the rate of speed may be an important factor in determining whether due care has been exercised. Whether, in view of the location of this particular crossing at the end of a deep cut, the obstruction, if any, to the view of the approaching traveler, the failure to sound signals of warning, and other attendant circumstances, the rate of speed in this instance had any tendency to indicate a want of reasonable care on the part of the defendant was a question of fact, and not of law." See, also, to the same effect, *Kinyon v. R. R. Co.*, 118 Iowa, 349; *Hart v. R. R. Co.*, 109 Iowa, 631.

VI. Instruction No. 6 read as in this wise: "If defendant permitted box cars to remain on the side track anywhere near the crossing in question, that would not constitute negligence; but, if cars were upon the side track near the crossing so as to obstruct the view of the track from the highway, that fact may be considered by you in deciding whether or not reasonable and adequate signals were given, and also in deciding whether or not the plaintiff used due care in approaching the crossing just before the accident." This instruction was also erroneous, as we view it, in that it confined the jury to a consideration of defendant's failure to give signals, whereas it should have covered other matters of negligence charged; as, for instance, the speed of the train. As sustaining this view, see *Artz v. R. R. Co.*, 44 Iowa, 288; *Reed v. R. R. Co.*, 74 Iowa, 188.

6. Same.

VII. A part of instruction No. 8 reads as follows:

"If you find from the evidence under previous instructions that defendant's employees in charge of the train in question were negligent in any or all the respects named in the first instruction, and that such negligence was the direct and proximate and natural cause of the plaintiff's injuries complained of, then your verdict should be for the plaintiff in some amount, unless plaintiff has failed to establish the fact that he was free from all negligence on his part that caused, or in any manner contributed to, his injuries, as explained later on in these instructions." It will be noticed that by this instruction plaintiff was compelled to negative all negligence on his part. True, the instruction also says "as explained later on in these instructions." That plaintiff is not required to negative all negligence on his part is so well established by the authorities that we need do no more than cite them. See *Jerolman v. R. R. Co.,* 108 Iowa, 177; *Reitveld v. R. R. Co.,* 129 Iowa, 249; *Camp v. R. R. Co.,* 124 Iowa, 238. No subsequent instruction was given which cured this error, even if it could have been so cured.

> 7. SAME: con-
> tributory neg-
> ligence.

VIII. · This same error was repeated in the ninth instruction, and in this latter instruction the court also said: "In approaching the crossing in question plaintiff was required to be vigilant in the use of his senses, bearing in mind the dangers to be apprehended, and to use ordinary care under all the circumstances to look and listen, or to stop and look and listen, at such reasonable place or places as you may believe would best enable him to discover an approaching train and to promote his own safety. If you find from the evidence that plaintiff could have seen the approaching train by looking in the direction of its approach before he reached the crossing, and in time to have avoided the collision by ordinary care, and omitted to do so, such omission was negligence on his part; and, if it

> 8. SAME: duty to
> stop, look and
> listen: degree
> of care re-
> quired.

caused or in any manner contributed to plaintiff's injury, then he can not recover, and your verdict should be for the defendant." These two sentences are also erroneous. Plaintiff's conduct was not to be judged from a finding of the jury after the accident that he did not stop to look and listen at the best place or places to discover the train. This would call for the very highest degree of care on his part, whereas nothing but ordinary care was required of him. *Schulte v. R. R. Co.*, 114 Iowa, 94. Moreover, in the second paragraph the jury is told that, if plaintiff could have seen the train in time to have avoided the accident, and did not then exercise ordinary care, he could not recover. This, too, is erroneous. *Baldwin v. R. R. Co.*, 63 Iowa, 210. In the latter case it was said: "The plaintiff can not be deemed to have been necessarily guilty of contributory negligence if the danger might have been seen, and avoided if seen." See, also, *Artz v. R. R. Co., supra; Christiansen v. R. R. Co.*, 140 Iowa, 345.

IX. The latter part of instruction 9 reads as follows: "In order to recover herein it is the law that the burden of proof on this issue is on the plaintiff, and to recover he must show that he himself was free from all negligence that caused or in any manner contributed to his injury. And this is true even though the defendant's employees are shown to have been negligent, and their negligence also contributed to the injury. The law will not permit a recovery on the ground of negligence whenever the injury is the result of the negligence of both parties at the same instant of time. If plaintiff has failed to show by a preponderance of the evidence that he was free from negligence contributing to his injury, your verdict should be for the defendant, unless plaintiff has made a case under the claim of 'last clear chance,' as stated in the next instruction." This was followed by the tenth instruction, reading: "If the engineer exercised ordinary care and diligence to prevent a collision

9. SAME: last clear chance instruction.

after he saw the plaintiff in a position of peril, or it was evident he was going into a place of peril then plaintiff can not recover on this claim of 'last clear chance.' If the defendant did not use ordinary care and diligence to prevent a collision, as herein stated, such failure would be negligence on his part, and, if it caused the accident in question, and the plaintiff was free from negligence at the instant of the collision, as herein stated, such failure would be negligence on his part, and, if it caused the accident in question, and the plaintiff was free from negligence at the instant of the collision, even though he had been negligent at some time before that instant, then and in such case the plaintiff may recover on this claim; but, if the plaintiff himself was negligent at the very instant of the collision and such negligence in any manner contributed to his injury, then and in such case the plaintiff can not recover under this claim. The rule of 'last clear chance' does not apply to the case of a plaintiff who was himself negligent at the very instant of the injury for which he sues, if such negligence in any manner contributes to his injury."

The trial court seems to have been laboring under a misapprehension of the doctrine of "last clear chance," as it has been called. It is not true that a plaintiff can not rely upon the doctrine if his negligence continued down to the very instant of the collision. This may be true in some cases, of course; but it is by no means an universal rule. The rule for this state, as applied to the facts which a jury might have found, is this: In the application of that doctrine it is not necessary to find that the negligence of the plaintiff had ceased to operate before the accident occurred, and that, if it had ceased to operate, the defendant with knowledge of plaintiff's danger due to his own negligence, had failed to take reasonable precautions to avoid injury to him. It was enough to call for the application of that doctrine that the defendant's employees

knew of plaintiff's danger in time to have avoided injury
to him in the exercise of reasonable care, even though
he was negligent in putting himself in a place of danger,
and continued to be negligent in not looking out for his
own safety. *Barry v. R. R. Co.,* 119 Iowa, 62; *Doherty
v. R. R. Co.,* 137 Iowa, 358; *Purcell v. R. R. Co.,* 109
Iowa, 629; *Kelly v. R. R. Co.,* 118 Iowa, 390. There
is general agreement in the authorities that, where an
engineer actually sees a person in a position of danger,
and then fails to do what he reasonably can to prevent an
accident, the railroad company is held responsible for the
resulting injury, irrespective of the question of contribu-
tory negligence. If just before that climax only one party
had the power to prevent the catastrophe, and he neglected
to use it, the legal responsibility is his alone. If, how-
ever, each had such power, and each neglected to use it,
then their negligence was concurrent, and neither can re-
cover against the other.

The trial court evidently had in mind the rule which
applies when neither party discovers the other and the neg-
ligence is concurrent, or to a case where one has no bet-
ter opportunity than the other to anticipate
the accident, or any better means of prevent-
ing it than the other. But there was enough testimony in
this case to take the question to the jury as to whether or
not the defendant might not have prevented the injury, al-
though the plaintiff was negligent down to the very time
of the collision. It is one thing to hold that the continu-
ing negligence of a plaintiff will prevent a recovery for a
negligent omission of defendant to discover his peril, and
quite another to hold that plaintiff's continuing negligence
will prevent a recovery for the negligence of the defend-
ant in failing to take proper care to avert the accident
after the plaintiff's danger had been discovered and ought
to have been appreciated. If each party is negligent in
failing to discover the danger, then the negligence is ordin-

10. Same: evidence.

arily concurring, and the doctrine of last fair chance does not apply. But if defendant discovered plaintiff's negligence and his peril in time to have avoided the injury, and did not take the necessary means to do so, then the doctrine does apply in full force; for in such cases the defendant has the last opportunity of avoiding the collision. This thought was not presented to the jury by the instructions given. Indeed that view of the case was distinctly withdrawn. In this there was manifest error.

X. Instruction No. 11, given by the trial court reads: "If you believe from the evidence that at some time before the plaintiff reached a place of actual peril, and when by

11. RAILWAYS: crossings: contributory negligence.

the exercise of ordinary care he might have avoided a collision by stopping his team or turning it aside after the danger signal was sounded and was heard by him, and he then saw the approaching train, it was his duty to stop the team or turn it aside, and the engineer had the right to assume that he would heed the signal and avoid the danger of a collision, and to act upon his assumption until such time as it was made evident to him that plaintiff was about to go into a place of peril in spite of the warning. If you find from the evidence that the facts were as stated in this instruction, then it was negligence for the plaintiff to go forward, and if he did so, and was injured as a consequence, he can not recover herein, and your verdict should be for the defendant." It is somewhat difficult to understand just what this instruction means. From one point of view it is clearly erroneous, as said by this court in *Adams v. R. R. Co.,* 138 Iowa, 487. "If a traveler observes a car at such a distance that in the exercise of ordinary prudence he believes he can safely cross, and in undertaking to do so a collision occurs, this can not be attributed to negligence on his part"—citing *Patterson v. Townsend,* 91 Iowa, 725; *Ward v. Marshalltown Co.,* 132 Iowa, 579. See, also, as supporting this proposition,

*Powers v. Railway,* 143 Iowa, 427. See page 434, where we said: "If, under the circumstances as they reasonably appeared to him, plaintiff was justified in thinking that he could cross the track in safety, and he was in fact injured by reason of the improper speed at which the car was operated, his right to recover is not conclusively negatived by proof that, if he had looked just before coming into the immediate proximity of the track, he might have discovered his danger and avoided it." Moreover, the instruction tells the jury that, if plaintiff might at some time before he reached a place of peril have avoided the peril by stopping his team, or otherwise, then he was guilty of negligence. That this was error see *Winey v. Railroad,* 92 Iowa, 622; *Mackerall v. Railroad,* 111 Iowa, 547; *Meyer v. Railroad,* 134 Iowa, 722; *Hartman v. Railroad,* 132 Iowa, 584.

Again, from another view, the instruction is erroneous in that it failed to state a well-understood principle of law that, when one is confronted with a sudden peril, it is not necessarily negligence on his part if he takes the more dangerous of two or more means of escape. That this is a fundamental rule see *Pierson v. R. R. Co.,* 127 Iowa, 13; *Cummings v. R. R. Co.,* 114 Iowa, 85, and cases cited.

12. Same.

For the many errors pointed out there must be a reversal of the judgment. It must not be assumed from this reversal, however, that we believe plaintiff was free from contributory negligence. That was, as we believe, a fair question for the jury under proper instructions. With proper instructions a jury might find that plaintiff was negligent, but it is not our province to do so. The parties are entitled to the verdict of a jury upon this question under proper directions from the trial court. Neither should it be inferred that we think a verdict should be returned for plaintiff under the rule of the "last clear chance." That, too, we regard as a jury question, more doubtful,

perhaps, than the first question of fact. These observations are made because of defendant's insistance that, no matter what errors the trial court may have made, the judgment should not be reversed, because upon the whole record there should have been a verdict and judgment for it. We think there was enough testimony to take the case to the jury on both propositions, and that plaintiff is entitled to the judgment of a jury upon proper instructions.

Appellee's counsel suggest that the record is not in such shape that we may consider the propositions discussed, or any others; but with this we can not agree. Proper exceptions were saved to the instructions reviewed, and all other points discussed were properly preserved of record and presented to us in the briefs. These latter were made more prolix and extended than they should have been, but here again counsel are equally in fault.

The result is that the judgment must be and it is reversed, and the cause remanded for a retrial.—*Reversed and remanded.*

EVANS, C. J. (dissenting in part).—I do not dissent from the final word of the majority opinion, but there is much of such opinion in which I can not concur. I only care to specify and discuss the seventh, ninth, and tenth divisions of such opinion.

I will pass the seventh division for last consideration, and will consider first the ninth division of such opinion. This involves a discussion of the doctrine of the "last clear chance." Our previous decisions are not wholly consistent in their discussion of this doctrine. Special attention was given to this subject in the recent case of *Bourrett v. R. R. Co.* (Iowa) 121 N. W. 380. The pronouncement made in the present majority opinion is quite inconsistent with the holding of the majority opinion in the *Bourrett* case, and creates further complication in our holdings on

that subject. Briefly stated, the holding of the majority opinion in the *Bourrett* case was that the doctrine of last clear chance involves the question, not of comparative negligence, but of proximate cause. The theory of the application of the doctrine is, as there set forth, that the *subsequent* negligence of the defendant became the proximate cause of the injury, and that the previous negligence of the plaintiff was therefore not a *contributing* agency. Such negligence of the defendant is sometimes designated as "negligence after negligence," or "subsequent negligence." If the previous negligence of the plaintiff is no part of the proximate cause, then it is not *contributory,* and it is an inaccuracy of speech to call such negligence "contributory negligence." This is the substance of the holding in the *Bourrett* case. The analysis worked out in that case was that the liability of the defendant arose under this doctrine by reason of its negligence after the previous negligence of the plaintiff had ceased to operate, and because such previous negligence could not be deemed a part of the proximate cause. If this is a correct analysis, then it can not be said that a plaintiff may recover under this doctrine, even though his *contributory* negligence existed up to the moment of the accident, because if such negligence was no part of the proximate cause, it could not be *contributory.*

The position taken by the majority opinion at this point is a substantial quotation from the case of *Powers v. R. R. Co.,* 115 N. W. 496 (Iowa). It is overlooked, however, that a rehearing was granted in that case, and that a subsequent opinion was filed therein which entirely abandoned the position upon which the majority opinion now rests. See 143 Iowa, 427. In the subsequent opinion it was held that the doctrine of "last clear chance" had no application to the case. I quote the third division of such opinion, which is as follow: "The motion for new trial also raised the question whether there was not such evidence in the record as to require an instruction to the jury, as to the

doctrine of the last fair chance. Under the rule announced in the recent case of *Bourrett v. Chicago & Northwestern Railroad Company* (Iowa) 121 N. W. 380, the plaintiff was not entitled to a submission of the question of defendant's liability on the principle that defendant's employee should have discovered, and might have averted, the injury to plaintiff, notwithstanding plaintiff's contributory negligence, if the contributory negligence of the plaintiff continued up to the very moment of his injury. Without elaboration, it is sufficient to say that, under the record as presented, the court was not bound to submit to the jury the question of defendant's liability under the doctrine of the last fair chance. What has been said in the case just cited sufficiently indicates the views of the court as applied to the case before us. The duty of the defendant's employee to avoid the injury to the plaintiff approaching its track was not greater than the duty of the plaintiff to avoid injury from the approaching car, and these duties were concurrent and continuous up to the moment of the accident. If it should be found by the jury that plaintiff was guilty of contributory negligence in failing to look out for the approaching car before he stepped upon the track, then the defendant could not be held liable for negligence of its employee in failing to avoid injury to plaintiff at that time."

I find nothing in the cases cited in the majority opinion which would justify us in holding that the tenth instruction of the trial court was erroneous. The *Purcell* case, 109 Iowa, 628, was a case where the injured party had by his own negligence ventured upon a bridge. When his danger became imminent, and apparent to the engineer, he was helpless to save himself, except by jumping from the bridge. Such a situation is covered fully by our holding in the *Bourrett* case. The negligence of the engineer arose after the negligence of the injured party had spent itslf. The *Kelly* case (118 Iowa, 390), was one where

the injured party was a section hand, and was engaged in driving spikes upon the track. The morning was cold, and his cap was pulled down over his ears. He was not aware of the approach of the train, and the evidence tended to show that this fact was known to the engineer in time to have protected him. It was held that his failure to discover his danger would not necessarily defeat him. Whether in this class of cases the liability of the defendant should be predicated upon the doctrine of last clear chance, or upon the theory of willful or wanton injury, is one of the questions upon which there is much diversity of opinion in the authorities. In the *Kelly* case this court did not in terms specify the theory upon which the liability was sustained. The opinion in the case recognizes a distinction between the case then under consideration, where the injured party was already in the place of danger, when discovered, and that class of cases where the injured party was not in a place of danger when observed by the trainmen, but negligently proceeded into the danger zone at such time and place when it was too late for the trainmen to protect him. In the latter class of cases it is usually held that the trainmen are not ordinarily bound to anticipate that such a person will proceed into the danger zone and the duty of the trainmen to stop a train does not arise until the peril of such person is apparent or imminent. In such a case trainmen are not required to stop their train by the mere fact that they may see persons near the track outside the zone of danger, even though they be approaching such zone of danger. In the case at bar the plaintiff was driving toward the crossing. The front feet of his horses had but just reached the main track as the train came upon him. He turned them to one side, and the side of the passing train brushed down horses and wagon. It is manifest, therefore, that he had been in the danger zone for only a moment before the collision.

The *Doherty* case, 137 Iowa, 358, does not support

the majority opinion. It was there held that the doctrine of last fair chance had no application to the case, and the judgment below was reversed on that ground. I quote from the opinion as follows: "In this situation of the evidence there was no room for application of the doctrine of the last fair chance. That doctrine can have application only in the cases where it is made to appear that the negligence of the defendant culminating in the accident arose after the discovery of the position of danger in which plaintiff, by his own negligence, had placed himself. This is upon the theory that under such circumstances the negligence of defendant, and not the prior act of negligence of plaintiff, must be regarded as the proximate cause of the accident. . . . It is no doubt true, by the great weight of authority, that in the case of steam railways operated over private ways there can be no recovery for injuries sustained by one negligently exposing himself to danger, except on proof that, after being actually discovered, the railway employees might have stopped the train, and negligently failed to do so. As the proposition is put in some of the cases, the injury inflicted, to be recoverable for, must appear to have been wanton in the sense that the person in charge of the train, after being made aware of the danger, and having the means at hand by the use of which he might have prevented the accident, negligently failed to adopt or make use of such means. But in this state, as in many of the other states, the rule applicable in steam railway cases is departed from when dealing with accidents arising out of street railway operation, to the extent, at least, of holding that proof of actual knowledge of the position of danger of the party who suffers injury is not in all cases required." The case above quoted from was a street railway case.

The *Barry* case, 119 Iowa, 62, was also a street railway case. It was held that there was evidence tending to show that the motorman did see the deceased in the place

of danger in time to have avoided his injury. Turning to the case at bar, it is very doubtful in my mind that the plaintiff was entitled to an instruction at all on the doctrine of last clear chance. Assuming that the engineer saw him for some distance before the engine reached the crossing, he was not in a place of danger at that time. He was approaching the crossing, it is true. So was the train. I find nothing in the evidence to charge the engineer with knowledge that the plaintiff would undertake to cross the track in front of the train until he drove his team into the danger zone. Up to this time at least, the engineer had the right to presume that the plaintiff would stop and give the train the right of way over the crossing. The plaintiff can invoke the doctrine of last clear chance only upon the theory that, after his intention to cross the track ahead of the train became apparent to the engineer, such engineer, in the exercise of ordinary care, could have stopped his train. In view of the new trial to be had I will not discuss that question of fact. Assuming that the plaintiff was entitled to an instruction on the subject, it seems to me that instruction No. 10, given by the trial court, was applicable to the evidence, and was in accord with the rule announced in the *Bourrett* case.

II. I can not concur in division 10 of the majority opinion. This division deals with instruction No. 11, given by the trial court. The instruction is set out in full in such division, and I will not repeat it. I do not think the instruction is amenable to the criticism which is made upon it, either as to its substance or form. The substance of this instruction is that, if by the exercise of ordinary care plaintiff could have avoided the collision by stopping his team after he heard the danger signal and saw the approaching train, it was his duty to stop it. As an abstract proposition, this sounds to me like elementary law, and yet this is the very point in which the instruction is

criticised. Surely, if the plaintiff saw the approaching train in time to stop by the exercise of ordinary care, he was as much bound to stop as was the engineer who saw the approaching team. There is no room in such a case for the application of the doctrine of last clear chance. It is also true in such a case that the engineer might properly assume that the plaintiff would avoid the collision, and that he might act upon such assumption until "it was made evident to him that plaintiff was about to come into a place of peril in spite of the warning." This instruction does not assume to determine plaintiff's contributory negligence as a matter of law upon the evidence, but it holds him only to the exercise of ordinary care. It requires the jury to determine whether *ordinary care after the plaintiff saw the approaching train* would enable him to avoid a collision by stopping his team. This proviso disposes also of the suggestion of "sudden peril," which is made in the majority opinion. Ordinary care was the measure of plaintiff's duty at all times. What would constitute ordinary care would vary and depend upon the circumstances surrounding him, including "sudden peril" or other distracting circumstances, and there is nothing in the instruction complained of which excludes the consideration of such circumstances by the jury in determining the question of ordinary care.

III. In the seventh division of such opinion the eighth instruction of the trial court is held to be erroneous. In this instruction the trial court instructed the jury that it was incumbent upon the plaintiff to prove that "he was free from all negligence on his part that caused, or in any manner contributed to, his injuries, as explained later in these instructions." It is held that plaintiff was not required to negative *all* negligence, and that the instruction was therefore erroneous. This holding of the majority opinion has support in the case of *Jerolman v. R. R. Co.,* 108 Iowa, 177, and my criticism is directed pri-

marily to the holding in that case. The holding in that case is so clearly out of 'line with our other cases that it has never been expressly followed until now, and I think it ought to be frankly overruled. The instruction under consideration in the *Jerolman* case was that the plaintiff must show herself free from "all negligence" which contributed to her injury. It was said in the opinion that this imposed upon the plaintiff a higher degree of duty than ordinary care. It was conceded therein that "any want of ordinary care, however slight," if it contributed to the injury, would defeat the plaintiff's cause of action. But it was argued therein that "slight want of ordinary care must not be confused with slight negligence." To my mind the reasoning at this point was not sound. It is a truism to say that the plaintiff must prove freedom from contributory negligence. *Freedom* from contributory negligence implies the exclusion of *all* contributory negligence. "Want of ordinary care" is the stereotyped definition of negligence when ordinary care is the measure of duty imposed. Negligence is want of ordinary care. Want of ordinary care is negligence. In the *Jerolman* case it was held that it would be proper to instruct that the plaintiff must show freedom from any want of ordinary care. "All negligence" and "any want of ordinary care" are equivalent under our stereotyped definition.

In the case of *Root v. R. R. Co.*, 122 Iowa, 469, the trial judge (the late Justice Bishop, then on the trial bench) evidently undertook to conform to the holding in the *Jerolman* case. He instructed the jury that it was incumbent upon the plaintiff to prove that she did not by her own negligence contribute *"in any material degree* to her own injury." This instruction was condemned as contrary to previous authorities. No reference however is made in the reversing opinion to the *Jerolman* case. In *Camp v. R. R. Co.*, 124 Iowa, 238, another trial judge instructed the jury that it was incumbent upon the plain-

tiff to show that he was not "to any material degree negligent himself." This phraseology was distinguished from that used in the *Root* case, and the instruction was sustained on the authority of the *Jerolman* case. In *Rietveld v. R. R. Co.,* 129 Iowa, 249, the *Jerolman* case is cited, among others, but it is in no sense followed on this point by any holding in the opinion. Indeed the language used in this opinion is contradictory, rather than confirmatory, of the *Jerolman* case in this respect. It is said therein: "Of course the plaintiff's negligence must be such as contributes proximately to his injury; but, if it does so in whole or in part, in any manner or to any degree, there can be no recovery on his behalf." The citation of the *Jerolman* case is made in support of the quoted proposition. The *Jerolman* case was decided ten years ago, and has never since been squarely followed on this point until now. The attempt to follow it in the *Camp* case resulted in a superfine distinction between the holding in the *Camp* case, *supra,* and the reverse holding in the *Root* case, *supra.* It seems to me, therefore, that the *Jerolman* case ought to be regarded as out of line with the great body of our cases, and as hypercritical. I see no way to follow it consistently without the constant necessity of urging verbal distinctions where no practical distinction exists.

Some point is made in the Jerolman opinion of the fact that the trial court had not defined negligence. In the case at bar instructions 4 and 9 contain a sufficient definition of negligence as being want of ordinary care. That objection, therefore, is not applicable here. To that extent this case can be distinguished from the *Jerolman* case. I think the instruction of the trial court on this question should be sustained.