JAMES WILSON, Administrator, Appellant, v. ILLINOIS CENTRAL RAILROAD Co., Appellee.

**Railroads:** NEGLIGENCE. Where there is evidence that engine men failed to give the statutory signals upon approaching a highway, by ringing the bell or sounding the whistle, the issue of negligence is for the jury.

**Same:** CROSSING ACCIDENT: CONTRIBUTORY NEGLIGENCE: EVIDENCE. In this action for death at a railway crossing the evidence is reviewed and held to show that deceased was guilty of such contributory negligence in failing to stop and look or listen for an approaching train before attempting to cross the tracks as to prevent recovery, unless under the doctrine of the last clear chance.

**Same:** NEGLIGENCE: EVIDENCE: LAST CLEAR CHANCE. Where a traveler upon approaching a railway crossing is guilty of contributory negligence in failing to stop and look or listen for an approaching train, there can be no recovery for his death unless the train men saw deceased in a situation of peril and thereafter failed to take the necessary steps to prevent the injury, or the failure so to do was the proximate cause of the accident.
In this action the evidence is reviewed and held insufficient to establish negligence on the part of the engineer, in failing to stop his train after discovering the peril of deceased, or that such negligence was the proximate cause of the accident.

*Appeal from Dubuque District Court.*—HON. M. C. MATTHEWS, Judge.

THURSDAY, JANUARY 12, 1911.

ACTION at law to recover damages for the death of John Semmens, caused by his being struck by a train at a highway crossing. The trial court directed a verdict for defendant, and plaintiff appeals.—*Affirmed.*

A. M. *Cloud* and J. W. *Kintzinger,* for appellant.
VOL. 150 IA.—3.

*Kelleher & O'Connor* and *E. J. Fitzpatrick,* for appellee.

DEEMER, J.—John Semmens was killed in Dubuque County, Iowa, by a train operated by defendant, which collided with deceased at and in a public highway crossing in said county. The negligence charged against defendant is "that there was a high embankment on either side of said defendant's tracks at and easterly of said railway crossing; that said defendant railroad company was negligent in allowing obstruction consisting of tall weeds, trees and grass to be and remain upon and along the top of said embankment alongside of its tracks so as to prevent persons approaching the same from the north from having a clear and unobstructed view of its tracks and cars approaching thereon from the east. Said railroad company was also negligent in failing to sound any bell or whistle at the regular whistling post for said crossing, or give any other warning of the approach of said train before reaching said crossing; plaintiff further states that said defendant was further negligent in this: That defendant's engineer operating the engine of said train saw the team driven by said deceased approaching said public crossing in time to have averted the accident had he used ordinary care in attempting so to do; that said engineer at the time he first saw said team approach said crossing knew of the dangerous position in which the deceased was placed, and said engineer could, by the exercise of ordinary care, have avoided the injury to said John Semmens, deceased, had he used ordinary care in attempting to do so or to slacken or stop the speed of the train sooner than he did, but said defendant's engineer knowing of the dangerous and perilous position in which deceased was placed failed to stop said train or slacken its speed sufficiently to have averted said injury." These allegations of negligence were denied by defendant, and it also pleaded contributory negligence

on the part of plaintiff's intestate. The motion to direct was evidently sustained upon the theory that plaintiff's intestate was guilty of contributory negligence, and that because thereof there should be no recovery.

I.   There was sufficient testimony to take the case to the jury on the question of defendant's negligence. Several

1. RAILROADS: negligence.

witnesses testified that no bell was rung or whistle sounded while the train was approaching the highway crossing.

II.   We are also of opinion that the testimony shows contributory negligence of the deceased in approaching the crossing. The railway tracks at the point in question run

2. SAME: crossing accident: contributory negligence: evidence.

east and west. The highway over which deceased was driving runs north and south, and crosses the railway tracks at right angles. This crossing is about one mile west

of the town of Farley. Four hundred and sixty-five feet north of the crossing is what is known at the Glew house, and the highway from this house to the railway tracks is somewhat higher than the general lay of the land toward the town. There were no embankments on either side of the highway. The land to the east of the highway crossing is practically level and somewhat lower than the traveled part of the highway until it approaches a cut made for the railway tracks. This cut ran easterly from the highway crossing a distance of four hundred and fifty feet, the deepest point of this cut being five and one-half feet to the top of the rail and this deepest part was at the easterly end of the cut. On the north side of the railroad right of way was a snow fence five and two-fifths feet high extending the entire length of the cut. The cars and engines used by defendant in the train which struck deceased were approximately fourteen feet in height. While there was a cornfield north of the cut and in close proximity thereto, this field was something like five hundred and forty feet east of the highway, and did not obstruct

the view of oncoming trains. There were no other obstructions which would in any way interfere with sight of the train, save a few weeds on the inside of the railway fences, but these weeds offered no particular obstruction in any way interfering with a view of the approaching train. There was one small tree near the right of way which at some points in the highway offered a measure of obstruction to the sight of an approaching train, at least there was testimony to that effect. Plaintiff's intestate was driving south on the highway which we have described past the Glew house, and according to the undisputed testimony he could have seen the approaching train at any point in the highway after leaving the Glew house after the train left Farley, and at all times until it reached the highway crossing. It may be that under the testimony a jury would have been warranted in finding that there was a point sixty feet north of the crossing where one could not well see the approach of a train from the east, and that this condition existed to a point one hundred and fifty feet north from the track, being a distance of ninety feet where the train could not be seen or at least the view thereof was obstructed. Ordinarily where one is killed and there are no eyewitnesses of the transaction the law will presume that the person killed was in the exercise of ordinary care and doing nothing to jeopardize his life or limb. But this rule does not obtain where there are eyewitnesses. Here there was an eyewitness and he testified as follows:

I knew John Semmens in his lifetime. I remember of the Clipper train going east from Farley the afternoon that John Semmens was killed. Prior to the time the Clipper train came west I was going after my cow; she was tied up alongside the railroad. I know where the public highway is that runs east and west near Farley, and am familiar with where the highway turns off north to go up to the Glew home. My cow was tied about one

hundred feet east from the corner of the fence as the road turns up to go to Glew's. The cow was tied about eighty or ninety feet from the point where the road crosses the tracks coming south. I heard the Clipper train leaving Farley that day. When I heard the Clipper train come I was a little east of where my cow was tied. I kept right on going after the cow. . The next I heard was the train whistling at the whistling post. I was right near the cow at that time. I saw John Semmens that day, but not to speak to him, I noticed Semmens, as he left Glew's to go south. He left Glew's about the same time the Clipper train left Farley. Semmens had a box hayrack, and the team was a bay and a gray. After Semmens left Glew's I observed that he was standing in the middle of the wagon with his face to the west and back to the east. The team trotted right along down the road after he started. At the time the train sounded the whistle for the whistling post Semmens was about halfway between the railroad and Glew's. At that time I saw he was in the wagon. He was standing in the middle with his face to the west and back to the east. I saw and observed Semmens after the whistle sounded for the crossing at the whistling post as he came down the road toward the railroad. Q. Just tell the jury what he did, if anything? A. Didn't do anything; kept right on driving. Q. Tell the jury whether or not, from the time you saw him midway between Glew's house and the crossing and after the signal sounded, Semmens turned at any time to look easterly? A. No, sir; he didn't. Q. How did his team continue to go? A. Trotted right along. Q. You may tell the jury whether or not you heard any danger signals being sounded? A. Yes, sir; I did. Q. Did you see where Semmens was at that time? A. Yes, sir; he was right even with the snow fence. Q. At that time, tell the jury what was done, if anything, that you saw toward stopping this team or driving it forward? A. No, sir; he kept right on driving it. Q. How long did you see him? A. I saw him until the train came between me and him. I did not notice the position the lines were in. During all the time from the time he left the Glew crossing he was looking west. Q. Then you say that you noticed Mr. Semmens as he was coming down from the Glew road?

A. Yes, sir.  Q.  As he came down the Glew road, you saw him look to the east at one time; you say he looked to the east?  A.  No, sir.  Q.  Did you ever see him look to the east?  A.  No, sir.  Q.  At the time of the short whistles the team was just inside the snow fence, just about at the snow fence?

The engineer testified that when he first saw deceased he was approaching the right of way, and "I judged from the motion of the horses' heads that they were moving at that rate of speed; that the driver or party who was with them did not know that the train was approaching. I immediately shut off steam, set the brake and commenced to blow the alarm."

Under this state of facts it is clear that deceased was guilty of contributory negligence.  In *Schaefer v. C., M. & St. P. R. R.,* 62 Iowa, 624, we said: "If the plaintiff's son had stopped four or five rods from the track and looked for the train this accident would not have occurred, or if he had not stopped but looked for the train at a place where it could have been seen, the accident would not have occurred. Where a person traveling on the highway and approaching a known crossing of the railway track with knowledge that the view of the approaching train is, to an extent obscured, heedlessly permits the team he is driving to pass over such highway pretty fast or allowed the horses to trot, and makes no effort to look or listen for the approaching train for a distance of eighteen rods from the track, he is guilty of such contributory negligence as will prevent him from recovering if a collision occurs providing there are no circumstances which are calculated to distract his attention. Under the circumstances above stated and the uncontroverted evidence in this case, we think ordinary care required that the deceased should have stopped and looked or listened at some place between the place where the team was stopped and the track. There was nothing to prevent his doing so and nothing to distract

his attention." See, also, *Sala v. R. R.*, 85 Iowa, 678; *Bloomfield v. R. R.*, 74 Iowa, 607; *Reeves v. R. R.*, 92 Iowa, 32; *Payne v. R. R.*, 108 Iowa, 188; *Crawford v. R. R.*, 109 Iowa, 433; *McLeod v. R. R.*, 125 Iowa, 270; *Swanger v. R. R.*, 132 Iowa, 32; *Williams v. R. R.*, 139 Iowa, 552.

In view of the contributory negligence of the deceased there can be no recovery in this case, unless it be on the theory that the engineer or fireman on defendant's train saw plaintiff's intestate in a place of peril, and thereafter failed to take the necessary steps to avoid the collision, and that but for such failure the accident would not have happened.

III.    The doctrine of last fair chance as applied to the facts of this case is very well settled by our recent decisions.    In *Bruggeman v. R. R.*, 147 Iowa, 187, we said:

In the application of that doctrine it is not necessary to find that the negligence of the plaintiff had ceased to operate before the accident occurred, and that, if it had ceased to operate, the defendant with knowledge of plaintiff's danger, due to his own negligence, had failed to take reasonable precautions to avoid the injury to him.    It was enough to call for the application of that doctrine that the defendant's employees knew of plaintiff's danger in time to have avoided injury to him by the exercise of reasonable care, even though he was negligent in putting himself in a place of danger, and continued to be negligent in not looking out for his own safety.    *Barry v. R. R. Co.*, 119 Iowa, 62; *Doherty v. R. R. Co.*, 137 Iowa, 358; *Purcell v. R. R. Co.*, 109 Iowa, 629; *Kelley v. R. R. Co.*, 118 Iowa, 390.    There is a general agreement in the authorities that where an engineer actually sees a person in a position of danger, and then fails to do what he reasonably can to prevent an accident, the railroad company is held responsible for the resulting injury, irrespective of the question of contributory negligence.    If just before the climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone.    The trial court evidently had in mind the

.rule which applies when neither party discovers the other and the negligence is concurrent, or to a case where one has no better opportunity than the other to anticipate the accident, or any better means of preventing it than the other.   But there was enough testimony in this case to take the question to the jury as to whether or not the defendant might not have prevented the injury, although the plaintiff was negligent down to the very time of the collision.   It is one thing to hold that the continuing negligence of a plaintiff will prevent a recovery for a negligent omission of defendant to discover his peril, and quite another to hold that plaintiff's continuing negligence will prevent a recovery for the negligence of defendant in failing to take proper care to avert the accident after the plaintiff's danger had been discovered and ought to have been appreciated.   If each party is negligent in failing to discover the danger, then the doctrine of last fair chance does not apply.   But if defendant discovered plaintiff's negligence and his peril in time to have avoided the injury, and did not take the necessary means to do so, then the doctrine does apply in full force; for in such cases the defendant has the last opportunity of avoiding the collision.   This thought was not presented to the jury by the instruction given.   Indeed that view of the case was distinctly withdrawn.   In this there was manifest error.

Again in *Welsh v. R. R.,* 148 Iowa, 200, we said:

While it is true that a motorman is not bound to anticipate that a person not already in a position of danger from the approaching car will negligently put himself in such position of danger, yet when the motorman sees that a person on the streets is apparently placing himself in a position of danger without being aware of the approaching car, it is plainly his duty to take cognizance of that fact and avoid injury to him if practicable, and we have recognized the rule that under such circumstances the negligence of the persons in danger, which has thus become apparent to the motorman, will not relieve the street car company from liability for the negligence of the motorman in not taking reasonable precautions to avoid an accident. . . . In *Kelly v. Chicago, B. & Q. R. R. Co.,* 118

Iowa, 387, which is analogous in view of the fact that
the engineer in charge of the engine saw the person who
was in danger on the track negligently failing to keep any
watch for the approaching engine, it was held that not-
withstanding the negligence of the person on the track
the railway company was liable if the engineer failed to
use reasonable care in avoiding injury to him. . . .
The motorman was bound to use reasonable care not to
injure the plaintiff in the condition in which the plaintiff
had placed himself, even though he was guilty of negligence
in thus putting himself in a position of danger which he
might have avoided by reasonable precautions.

It is not true as appellee contends that as plaintiff's
intestate was negligent down to the very time he was
struck, there can be no recovery, even though the engineer
saw the deceased in a position of peril and
did nothing toward stopping his train. The
doctrine of last fair chance presupposes neg-
ligence on the part of the party injured and proceeds
upon the theory that notwithstanding this negligence, if
the other party, being cognizant of that negligence and of
the peril in which the party had placed himself, failed to
take the necessary precautions to avoid injuring him, he
is liable on the theory that he had a fair chance to avoid
the catastrophe by the use of ordinary care and his failure
to exercise it is in such cases the proximate cause of the
injury. It is defendant's subsequent negligence, after dis-
covering the peril differing in every essential from the
mere continuation of the original negligence for which
he is held liable. In order that this rule may be available
to an injured party he must show that the party whom
he seeks to charge with negligence knew of the perilous
position or saw the injured party, and knew or should
have known that he was in a position of peril. It is not
enough that he should have been on the lookout for him,
for in such cases it is the equal duty of each to look
out for the other, and mere failure to look for another

3. SAME: negli-
gence: evi-
dence: last
clear chance.

who is a trespasser or who is just as much bound as the party charged to keep a lookout, does not come within what is known as the last clear chance doctrine. In such cases there is nothing more than continuing negligence on the part of each, each having a duty to perform which he neglects. To apply the doctrine of last fair chance to such a case would be to introduce into our law the rule of comparative negligence, which did not, before the adoption of the employer's liability act by Congress, obtain in this state. It is important to find from the record where the employees saw the deceased and what they did after discovering him in a place of peril. The engineer testified as follows regarding this matter:

We were running about thirty-five miles an hour when we got in the vicinity of the Glew Crossing. The engine was working steam. The first thing that attracted my attention after leaving the whistling post was that I noticed on the south side (the wagon road is parallel there with the railroad) a threshing outfit and a vehicle ahead with horse or horses attached to it. The team ahead was getting fractious. I didn't really know whether the party was trying to hurry the team along or whether they were acting that way themselves, purposely, but this road runs parallel to the Central track there on south side as you go up. This crossing comes, and you can't turn a thing on that. I didn't know but that the man who was driving the team was trying to go ahead, and come across the crossing ahead of me. When I got to a certain point where I knew I was going to get to the crossing first I paid no more attention to them. After I looked away from that team I looked toward the track of the right of way of the company, my eyes turned back to the track. As my eyes came round I noticed horses' heads just approaching the right of way of the company on this crossing. I judged from the motion of the horses' heads that they were moving at that rate of speed that the driver or party who was with them did not know that the train was approaching. I immediately shut off steam, set the brake and commenced to blow the alarm. The alarm was the first thing

that was done because that was the first thing I reached for to warn. I reached for that with the right hand. The whistle rope reaches from the whistle lever to the back end of the cab so we can reach it from any point in the cab. We can reach it whether sitting down or standing up. I grabbed that with my right hand, and with my left hand shut off steam and set the brake. From the time I saw the team as it came trotting onto the right of way I made no delay in shutting off the steam and throwing on the emergency. I observed the team as it came up the line of the right of way where I first saw it until it got onto the tracks. They didn't reduce their speed as I could see any. The lines were hanging slack when the team came into view so I could see the lines and they continued hanging. There was no change at all in the speed of the team from the time I saw them come onto the right of way until the team went onto the track. I have been an engineer thirty years, and it was impossible for me, by the use of any appliance within the cab or within my power, to stop the train within that distance to avoid this collision. I done everything I could to warn the team and stop the train. The engine ran about four hundred and fifty or five hundred feet by the crossing when the train stopped. . . . I pulled the whistle and shut off the steam at the same time, and then applied the air. At the time the air was put on and the steam shut off I was blowing the whistle. The putting on of the airbrake and shutting off the steam and blowing the whistle was all done in the same instant—instantaneously, you might say. At that time I was two hundred feet from the crossing. I consider six hundred and fifty feet a good stop.

The fireman in the engine testified as follows:

At that time the engine was between two or three hundred feet from the crossing. . . . The engineer sounded the whistle. As we proceeded toward the crossing the bell was rung by myself. As we proceeded toward the crossing, after leaving the whistling post, I noticed something in the roadway on the south or left-hand side of the track. I was on that side of the engine. There was a threshing machine and a team and buggy ahead of

the threshing machine.   The team and buggy were near to the Glew Crossing, and the team seemed to be excited, and the driver was having to hold on to them pretty tightly. The next thing that attracted my attention as we went toward the crossing was the sounding of the alarm whistle. I noticed that the emergency brake was applied within a second after the danger whistle.   The first I saw of the accident was the horses on the left-hand side of the track after they had been struck.

The only thing which plaintiff offers to meet this testimony is some computations based upon the speed of the train, the place where it stopped, the distance traveled after the engineer saw the deceased, the fact that people riding in the train did not notice any application of brakes until after the team was struck, and the supposed distance traveled by the train after the engineer saw deceased.   There was some testimony to the effect that such a train running at thirty-five miles an hour, as this one was, could be stopped within three hundred feet; but the testimony also shows that it would run at least seventy-five feet after the engineer saw one in peril before he could get his brake to working, sound the alarm and shut off his steam.   The most favorable testimony for plaintiff showed that in a distance of two hundred feet a train running at thirty-five miles an hour might be slowed down to ten or twelve.   There was also testimony to the effect that the emergency brake was not set until after the team was struck.   There is no method of telling mathematically where the train was when the engineer and fireman first saw the team which deceased was driving.   The exact place where the team was when first seen by the engineer is a mere guess, but it was certainly not more than fifty feet from the track.   According to some of the testimony the team was going on a jog trot at the rate of about five miles per hour.   If we were to assume these guesses correct, and that the train was going seven times as fast

as the horses, and the horses covered fifty feet after the engineer saw them, then the train must have run three hundred and fifty feet after the engineer first saw the team.   All this, however, is mere guesswork, and should not be allowed to prevail over direct testimony as to the facts.   Plaintiff's case is this:   The engineer saw the team not more than three hundred feet from the crossing; he could have stopped his train, taking into account the shortest length of time needed to sound the alarm, shut off steam, etc., in three hundred and seventy-five feet.   This would not have avoided the collision, however, for plaintiff who was wholly oblivious of his surroundings and of the warnings given was still traveling toward his death, and his wagon, if not his team, would have been struck by the train. Whether or not he would have been killed had the engine struck the wagon at another place than where it did is of course a matter of merest conjecture.   A train going thirty-five miles an hour covers something like fifty feet per second, and in the short space of six seconds covers three hundred.   Giving the engineer time to sound the alarm, shut off steam, apply the emergency brake, and perhaps reverse his engine, it becomes perfectly clear that he could not, in this case, have stopped his engine in time to have avoided a collision.   There is not, therefore, in our opinion sufficient testimony to justify a verdict for plaintiff on the theory that the engineer was negligent after he saw deceased in a position of peril or that such negligence, if any there be, was the proximate cause of the injury.   In other words, even if it be conceded that the engineer did not apply the emergency brakes, as soon as he might, there is no sufficient showing that had he done so the accident would have been avoided.   Verdicts can not be based upon mere surmise and conjecture.   Of course circumstantial evidence is sufficient provided it shows that the fault of the engineer was the proximate cause of the harm.   But the circumstances must be such as to exclude

any other natural and reasonable hypothesis. The circumstances themselves must be something more than mere guesses. A conclusion is no stronger than the premises upon which it is based, and if these be mere guesses or surmises, the conclusion must also be so regarded. The trial court did not err in directing the verdict, and its judgment must be, and it is, *affirmed*.

EVANS, J. (concurring specially).—I concur in the result. I do not concur in the discussion of the doctrine of "last clear chance."