E. J. LYNCH, Administrator, et al., Appellees, v. DES MOINES RAIL-
WAY COMPANY, Appellant.

No. 41243.

NOVEMBER 15, 1932.

REHEARING DENIED MARCH 20, 1933.

Corwin R. Bennett, for appellant.

Vernon W. Lynch and Ralph N. Lynch, for appellees.

WAGNER, J.—In this action, the plaintiffs seek to recover damages for the death of John C. Lynch, alleged to have been caused by reason of negligence of the defendant's motorman. Among other grounds of negligence contained in the petition, the plaintiffs aver that the motorman was guilty of negligence in the following particular: "In negligently failing to sound a warning of his approach and/or in failing to reduce the speed of his street car by application of the brakes and/or failing to stop said street car after he had discovered the decedent in a position of danger." This quoted allegation raises the question of defendant's liability under the doctrine familiarly known as "last clear chance".

At the close of plaintiffs' evidence, the defendant moved for a directed verdict in its favor, and, at the close of all of the evidence, its motion for a directed verdict was renewed. This motion was overruled by the court and the case was submitted to the jury upon the sole question as to whether plaintiffs were entitled to recover under the "last clear chance" doctrine. The appellant contends that the court erred in overruling said motion. The appellees, in their argument allege: "Decedent was admittedly guilty of contributory negligence." Therefore, the question for our determination at this point is whether, under the record, the jury could properly find for the plaintiffs and against the defendant under the "last clear chance" doctrine. The legal principles involved in this doctrine are well established. In Wilson v. Illinois Central Railroad Co., 150 Iowa 33, at page 41, 129 N. W. 340, 344, 34 L. R. A. (N. S.) 687, this court declared:

"The doctrine of last fair chance presupposes negligence on the part of the party injured and proceeds upon the theory that notwithstanding this negligence, if the other party, being cognizant of that negligence and of the peril in which the party had placed himself, failed to take the necessary precautions to avoid injuring him, he is liable on the theory that he had a fair chance to avoid the catastrophe by the use of ordinary care and his failure to exercise it is in such cases the proximate cause of the injury."

The doctrine of "last clear chance" is applicable only if the defendant, or the motorman in the instant case, had actual knowl-

edge of the perilous position of the other party and failed to use due care to avoid the injury which, by the exercise of due care, after acquiring the knowledge, could have been avoided. See Graves v. Chicago, Rock Island & Pacific Railway Company, 207 Iowa 30, 222 N. W. 344; Carr v. Inter-Urban Railway Company, 185 Iowa 872, 171 N. W. 167; Waters v. Chicago, Milwaukee & St. Paul Railway Company, 189 Iowa 1097, 178 N. W. 534; Williams v. Mason City & Fort Dodge Railway Company, 205 Iowa 446, 214 N. W. 692; Stanoshek v. Chicago, Rock Island & Pacific Railroad Company, 198 Iowa 62, 199 N. W. 310; Radenhausen v. Chicago, Rock Island & Pacific Railway Company, 205 Iowa 547, 218 N. W. 316. Many other cases could be cited on this proposition. The knowledge by the defendant of the perilous position of the other party may be proven by circumstantial, as well as by direct, evidence. See Williams v. Mason City & Fort Dodge Railway Company, 205 Iowa 446, 214 N. W. 692; Carr v. Inter-Urban Railway Company, 185 Iowa 872, 171 N. W. 167; Wilflin v. Des Moines City Railway Company, 176 Iowa 642, 156 N. W. 842. In Carr v. Inter-Urban Railway Company, 185 Iowa 872, 171 N. W. 167, 169, we said:

"and if it appears from the evidence that he [the motorman] had a clear unobstructed view of the track, the jury may infer from his duty to keep a lookout ahead that he in fact saw the injured person in a position of peril. This inference may, of course, be rebutted by evidence to the contrary."

In Wilflin v. Des Moines City Railway Company, 176 Iowa 642, 156 N. W. 842, 844, we declared:

"Of course, the motorman must have seen the person in peril on the track ahead in time to have avoided a collision, according to the majority in Bourrett v. Chicago & N. W. Ry. Co., 152 Iowa 579, 132 N. W. 973, 36 L. R. A. (N. S.) 957, but on the duty to keep a lookout and a clear field of vision may be based a finding that he did see in a suit against a street railway."

In Williams v. Mason City & Fort Dodge Railway Company, 205 Iowa 446, 214 N. W. 692, 695, we said:

"The legal rule is that the train operator in charge must know the 'peril' of appellee in order to fix liability upon appellants under the doctrine of 'last clear chance;' yet such knowledge and the time

the same is acquired may be proved by circumstantial, as well as direct, evidence."

█ It is a familiar rule that the party to the litigation against whom a verdict is asked to be directed is entitled to have the evidence considered in the light most favorable to him. This rule is so well established as to require no citation of authorities, but see Albright v. Chicago, Rock Island & Pacific Railway Company, 200 Iowa 678, 205 N. W. 462; Middleton v. Omaha & Council Bluffs Street Railway Company, 209 Iowa 1278, 227 N. W. 915; Harvey v. Knowles Storage & Moving Company, 215 Iowa 35, 244 N. W. 660; Hamilton v. Wilson (Iowa), 240 N. W. 685 (not officially reported); Robertson v. Carlgren, 211 Iowa 963, 234 N. W. 824.

█ With the foregoing well-established rules of law before us, we now turn to the evidence upon this decisive question. The decedent was killed on October 24, 1930, in a collision which occurred about 4:30 a. m. of that day, between a milk wagon drawn by a single horse, driven by the decedent, and a street car upon the appellant's track. There was no one in the street car at the time in question, except the motorman and one passenger. The collision occurred at the intersection of East 9th street, which runs north and south, and Morton avenue, which crosses East 9th street at a right angle. When the horse was hitched to the wagon the distance from the nose of the horse to the extreme rear of the wagon was approximately 18 feet. The street car track is upon East 9th street, and at the time in question, the street car was going south and the decedent was going east. The distance between the curbs on Morton avenue at the intersection is 26 feet and 2 inches; the distance between the curbs on East 9th street at the intersection is 34 feet and 6 inches. There are two street car tracks upon East 9th street at the place of collision, and the car was running southward on the west track. The distance from the west curb on East 9th street and the west rail of the west track is 9 feet and 9 inches, and the distance from the west curb line of said street to the east rail of the west track is 14 feet and 8 inches. The collision occurred about five or six steps, 15 to 18 feet, south of the north curb of Morton avenue, the street car striking the hub of the left hind wheel. The next street north of Morton avenue is known in the record as Grand View avenue. In approaching from the north there is a single track until Grand View avenue is reached, at which point there is a switch and from

there on southward, past Morton avenue, there are two tracks. There was no obstruction to prevent the motorman from seeing the milk wagon as it approached the intersection from the west. The motorman testified that he first saw the milk wagon when he was about 30 feet north of the switch on the single track. The distance from the north curb of Morton avenue to the south curb of Grand View avenue is 308 feet and 3 inches. Therefore it is shown by the record that the motorman saw the milk wagon when he was more than 300 feet from the point of collision. The sole passenger upon the street car was sitting in the third seat from the front, on the west side of the car, and he testified that, as the street car approached the switch near Grand View avenue, he saw the horse approaching from the west, the intersection of East 9th and Morton avenue. The motorman testified that he continued to watch the milk wagon from the point where he first saw it, down until the scene of the accident. "I watched him continually from a point 30 feet north of Grand View Avenue until the front end of my car was approximately even with the side walk line on the north side of Morton Avenue." It thus appears that, according to the motorman's testimony, he continually saw the horse and milk wagon driven by decedent until he was within a very few feet of the place of the collision.

Walter Reid, a boy between thirteen and fourteen years of age, a disinterested witness, was delivering papers in the early morning, and he saw the accident and related the circumstances surrounding the same. He came from the west on Morton avenue and followed a path running northeast across the vacant lot lying to the north of Morton avenue and the west of East.9th street. The east end of this path connects with a short sidewalk running from the sidewalk on the west side of East 9th street to the curb. The distance from this point south to the north curb on Morton avenue is 82 feet and 3 inches. He testified, "When I started on the path the milk wagon and horse were just starting down a little—just a little down an approach of the hill about one half way down the block. At that time the horse was going 7 or 8 miles an hour. The horse did not change its gait from then on up to the time of the collision as far as I could see. When I was about at the end of the path near that walk on the west side of 9th Street (a point 82 feet and 3 inches north of the north curb of Morton Avenue) the front end of the street car was just about even with the little sidewalk that goes out to the curb there. At that time the horse and milk wagon was be-

tween the curb line and the sidewalk line some place west of the southwest curb of Morton and 9th. I looked to see the horse and wagon at that time. It was over on the right hand side of the south end of Morton. I imagine that the horse's head would be about out to the curb. I seen that the horse was going about the same gait all the time. He was still trotting. When it got to the curb the horse just continued about at the same gait." He further testified that the street car was traveling about 20 or 25 miles an hour at that time, and that it did not change its rate of speed from that point to Morton avenue. The motorman testified that it was his judgment that he was proceeding at a rate of speed between 15 and 20 miles an hour at the time he entered the intersection. The record contains testimony by one of the city street car supervisors, who is familiar with the type of street car that was being used at the time in question, and who is familiar with the subject about which inquiry was made, that the street car in going 15 miles an hour could be stopped in 12 to 18 feet, and that the car in going from 20 to 25 miles an hour could be stopped in 40 to 45 feet.

It is true that the motorman had the right to assume that the decedent would not drive heedlessly upon the track. And until the motorman was advised that decedent was heedless of his own safety and was either in or about to place himself in a perilous situation, he was not obliged to act upon the theory that the decedent would be negligent and place himself in a position of peril. See Landis v. Interurban Railway Company, 166 Iowa 20, 147 N. W. 318; Welsh v. Tri-City Railway Company, 148 Iowa 200, 126 N. W. 1118; Powers v. Iowa Central Railway Company, 157 Iowa 347, 136 N. W. 1049; Gilliam v. Chicago, Rock Island & Pacific Railway Company, 206 Iowa 1291, 222 N. W. 12; Stanoshek v. Chicago, Rock Island & Pacific Railroad Company, 198 Iowa 62, 199 N. W. 310; Williams v. Mason City & Fort Dodge Railway Company, 205 Iowa 446, 214 N. W. 692. But when a motorman sees that another is apparently placed, or is placing himself in a position of danger, it then plainly becomes his duty to take cognizance of that fact and avoid injury to him if practicable. See Welsh v. Tri-City Railway Company, 148 Iowa 200, 126 N. W. 1118, and other cases hereinbefore cited.

It will be observed that the horse and wagon were nearly out of the way of a collision, the street car having hit the left hind wheel or hub of the wagon. The motorman does not claim that he believed that the horse and wagon would pass safely ahead of the

street car. His claim is that the horse was either standing still or traveling at a very slow rate of speed and suddenly started to run and darted in front of the street car. The jury could find from Reid's testimony that the horse was traveling on Morton avenue toward the street car line at a rate of speed of about 7 or 8 miles an hour; that the rate of speed of the horse and wagon continued the same, and that there was no change in the rate of speed at which the horse and wagon proceeded before the collision; that, when the horse's head was approximately 9 feet 9 inches from the west rail of the track and going east at a rate of speed of 7 to 8 miles per hour, the street car was then approximately 100 feet north of the point of collision and approaching at a rate of speed of 20 to 25 miles an hour. The jury could also find from the testimony that, while the motorman watched the decedent continually for a distance of more than 300 feet, until the front end of the street car was approximately even with the sidewalk line on the north side of Morton avenue, and, while the street car going at a rate of speed of 20 to 25 miles per hour, as testified to by Reid, could have been stopped in 40 to 45 feet, yet, the street car traveled a distance of approximately 100 feet and collided with the rear end of the wagon while it had advanced eastward without any change in the rate of speed for a distance of approximately 32 feet. Giving the testimony, as we must, its most favorable aspect for the plaintiffs, we think that the jury could properly find therefrom that the decedent was in a position of peril; that the motorman had actual knowledge thereof in time to avoid the injury; and that, upon acquiring such knowledge, he failed to exercise due care to avoid injuring him. It is uncontradicted that the motorman did nothing to stop the car until he was between the sidewalk line and the curb on the north side of Morton avenue. While there is a conflict in the testimony of Reid and the motorman as to the location of the horse and wagon when the car passed Reid at a point 82 feet and 3 inches north of the north curb of Morton avenue, and as to whether the horse and wagon continued to progress at the rate of speed of 7 to 8 miles per hour without any change therein as testified to by Reid, yet, said conflict presented a question for determination by the jury. The testimony of Reid and the other testimony hereinbefore mentioned present a proper case for determination by the jury as to the liability of the defendant-company under the "last clear chance" doctrine.

The defendant's motion for a directed verdict was properly overruled.

The appellant also makes complaint as against some of the instructions given by the court, which complaints we will now consider. The appellant in its argument alleges: "The defendant excepts to Instructions Nos. 2 and 4, for the reason that said instructions instructed the jury to return a verdict for the plaintiffs, without requiring a finding that plaintiff's decedent was free from contributory negligence, concurrent with the negligence of the defendant." There is no merit in appellant's contention at this point for, under the doctrine of "last clear chance," the requirement that the jury find that the plaintiff is free from contributory negligence is unwarranted, as said doctrine presupposes negligence on the part of the decedent. See Gilliam v. Chicago, Rock Island & Pacific Railway Company, 206 Iowa 1291, 222 N. W. 12; Bruggeman v. Illinois Central Railroad Company, 147 Iowa 187, 123 N. W. 1007, Ann. Cas. 1912B, 876; Smith v. Spirek, 196 Iowa 1328, 195 N. W. 736; Wilson v. Illinois Central Railroad Company, 150 Iowa 33, 129 N. W. 340, 34 L. R. A. (N. S.) 687. In Gilliam v. Chicago, Rock Island & Pacific Railway Company, 206 Iowa 1291, 222 N. W. 12, 15, we said:

"It is manifest that, if the instruction was meant to give the doctrine of last fair chance, the requirement that the jury find that the plaintiff was free from contributory negligence is unwarranted, as the doctrine of last fair chance presupposes negligence on the part of the plaintiff."

In Bruggeman v. Illinois Central Railroad Company, 147 Iowa 187, 123 N. W. 1007, 1013, Ann. Cas. 1912B, 876, we declared:

"It is not true that a plaintiff cannot rely upon the doctrine ['last clear chance'] if his negligence continued down to the very instant of the collision. * * * The rule for this state, as applied to the facts which a jury might have found, is.this: In the application of that doctrine it is not necessary to find that the negligence of the plaintiff had ceased to operate before the accident occurred, and that, if it had ceased to operate, the defendant with knowledge of plaintiff's danger, due to his own negligence, had failed to take reasonable precautions to avoid injury to him. It was enough to call for the application of that doctrine that defendant's employees knew of plaintiff's danger in time to have avoided injury to him in the

exercise of reasonable care, even though he was negligent in putting himself in a place of danger, and continued to be negligent in not looking out for his own safety. Barry v. R. R. Co., 119 Iowa 62, 93 N. W. 68, 95 N. W. 229; Doherty v. R. R. Co., 137 Iowa 358, 114 N. W. 183; Purcell v. R. R. Co., 109 Iowa 629, 80 N. W. 682, 77 Am. St. Rep. 557; Kelley v. R. R. Co., 118 Iowa 390, 92 N. W. 45. There is a general agreement in the authorities that, where an engineer actually sees a person in a position of danger, and then fails to do what he reasonably can to prevent an accident, the railroad company is held responsible for the resulting injury, irrespective of the question of contributory negligence. * * *

"It is one thing to hold that the continuing negligence of a plaintiff will prevent a recovery for a negligent omission of defendant to discover his peril, and quite another to hold that plaintiff's continuing negligence will prevent a recovery for the negligence of the defendant in failing to take proper care to avert the accident after the plaintiff's danger had been discovered and ought to have been appreciated. If each party is negligent in failing to discover the danger, then the negligence is ordinarily *concurring,* and the doctrine of last fair chance does not apply. But if defendant discovered plaintiff's negligence and his peril in time to have avoided the injury, and did not take the necessary means to do so, then the doctrine does apply in full force; for in such cases the defendant has the last opportunity of avoiding the collision." (Writer's italics.)

It is quite apparent from the foregoing authorities that there is no merit in appellant's contention at this point.

In Instruction No. 3, the court told the jury:

"You are instructed that it is the duty of a motorman on a street railway car, operating upon the public streets of a city, to keep a constant lookout for pedestrians or the drivers of vehicles whose right to the use of the street is equal to that of the street railway."

Appellant's exception to said instruction is couched in the following language:

"The court erred in giving to the jury Instruction No. 3, for the reason that said instruction required of the defendant a higher degree of care than that required by law; in keeping a constant

lookout when the defendant's duty should have been stated only to be that of using ordinary care in maintaining a lookout."

Appellant's contention, as raised in the exception, is answered by Carr v. Inter-Urban Railway Company, 185 Iowa 872, at page 878, 171 N. W. 167, 169. The instruction is apparently copied from said opinion. We there said:

"Amplification of the rules as stated in the foregoing cases could amount to little more than a restatement thereof. It is the duty of the motorman to keep *constant lookout* for pedestrians, or the drivers of vehicles, whose right to the use of the street is equal to that of the street railway, and if he sees a person in a position of peril upon the track in time to do so, he must stop the car, or use such other means as are available to him to avoid injuring such person, and if it appears from the evidence that he had a clear, unobstructed view of the track, the jury *may infer* from his duty to keep a lookout ahead that he in fact saw the injured person in a position of peril." (Writer's italics.)

The court in the basic instruction allowed a recovery only upon the doctrine of "last clear chance." He did not therein allow a recovery for failure to maintain a lookout. It is not so claimed by appellant in the exception nor in argument. It is apparent that there is no merit in the sole exception made by appellant to the instruction, which exception is hereinbefore quoted. As to whether the instruction might be vulnerable to a proper exception, other than the one taken by appellant, we need not and do not determine.

The appellant also raises some question as to the rulings of the court on objections to the introduction of the testimony. The same does not require specific mention. All of the same have had our careful consideration and we find no prejudicial error.

The amount of the verdict was $5,000. Upon return of the verdict, on March 19, 1931, the court immediately entered judgment against the defendant for said amount. In the instruction relative to the mortality life tables, the court told the jury:

"You are further instructed that it is agreed by the parties to this suit that said mortality tables show that an individual of the age of the deceased, John C. Lynch, had an expectancy of the probable continuance of life of twenty-eight and six tenths years (28.6)."

The statement "twenty-eight and six tenths years (28.6)" was erroneous. It should have been 28.06 years. To meet this situation, the plaintiffs, before the motion for a new trial was ruled upon, filed a remittitur in the sum of $100. The court on April 29, 1931, over-ruled the motion for a new trial and found that the plaintiffs had remitted $100 from the $5,000 verdict of the jury. The court neg-lected to set aside the judgment of $5,000 entered on March 19, 1931, and on April 29, 1931, entered a second judgment in words and figures as follows, to wit:

"It is, therefore, ordered, adjudged and decreed, that judgment enter in favor of the plaintiffs and against the defendant in the sum of Four Thousand Nine Hundred Dollars ($4,900.00) and all costs of this action."

It thus appears that there is a $5,000 judgment against the ap-pellant under date of March 19, 1931, and a $4,900 judgment against the appellant under date of April 29, 1931. The appellant claims nothing because of the error contained in the court's instruction rela-tive to the mortality tables. When the appellees' attention was called to the foregoing situation of apparently two judgments, it filed a remittitur stating:

"Since two judgments were entered by mistake we hereby remit any sum other than one judgment for $4,900.00 with interest as provided by law and all costs of this action from the date of the first judgment entry."

It is therefore apparent that only the sum of $4,900 with inter-est and costs, can be collected from the appellant, and that it has not been injured by a failure on the part of the court at the time of passing on the motion for a new trial to set aside the former judgment and render a judgment at that time for $4,900.

We have considered all matters urged in argument by the ap-pellant and find no prejudicial error. The judgment in the amount of $4,900, with interest from the date of the first judgment entry and all costs, is hereby affirmed.—Affirmed.

STEVENS, C. J., and FAVILLE, DE GRAFF, and ALBERT, JJ., concur.