GRACE M. SMITH, ADMX., ETC., RESPONDENT, v. CHICAGO, ROCK-ISLAND & PACIFIC RAILWAY COMPANY, APPELLANT.—71 S. W. (2d) 842.

Kansas City Court of Appeals.   May 21, 1934.

*Hubbell & Moore* for respondent.

*Luther Burns, Conrad & Durham, Hale Houts* and *Ilus M. Lee* for appellant.

SHAIN, P. J.—This action by Grace M. Smith, Administratrix of the estate of her husband, Dr. N. A. Smith, deceased, as plaintiff, against Chicago, Rock Island & Pacific Railway Company, defendant, is an action for damages for the death of Dr. N. A. Smith, who it is admitted, received his injury at the crossing of the defendant's railroad with Elm Street in the town of Lineville, Wayne County, Iowa.

The defendant's railway runs north and south through Lineville. Its grade to the north is testified to as being seven-tenths of one per cent rise. Elm Street runs east and west and is the most northern street in Lineville. The right-of-way of the railroad extends fifty feet each way from the center of the track. The track runs on a straight line from the crossing to the east for a quarter of a mile. Elm Street is forty-six feet wide with a dirt roadway of twenty-two feet.

Dr. Smith lived on the south side of Elm Street and in the second house east of the railroad. In going west from the Smith home to the railroad crossing, the view to the south is obstructed by a house on what is termed the Krider Place and also by some trees which are to the west of the house.

There is testimony on behalf of plaintiff to the effect, that from a point in Elm Street thirty-six feet east of the railroad right-of-way, the vision to the south on the railroad is clear for the distance of 1000 feet. The evidence discloses that from the right-of-way of the railroad to the east there is an upward incline of the Elm Street roadway of approximately three feet to the crossing.

On the morning of the accident the defendant's train, an extra consisting of engine, tender and caboose, was northbound and Dr. Smith, the deceased, was driving in a model "A" Ford coupe in a western direction on Elm Street and was going to his office which was west of the railroad tracks.

It appears that the train, an extra, was not running on any usual schedule time. The highest rate of speed testified as to the train is twenty miles per hour. The highest rate of speed testified as to the automobile is fifteen miles per hour.

There is expert testimony offered by plaintiff estimating that the

train could have been stopped when going fifteen to twenty miles an hour within thirty feet. The evidence is to the effect that deceased could have stopped his car in a distance of six feet.

The accident happened around 7 A. M. The depot was quite a distance south of the scene of the accident. The train went through without stopping at the depot.

Quite a number of witnesses were used by both sides. Four of plaintiff's witnesses saw the accident, two of whom, a Mrs. Nichols and her daughter, Mary Keeton, had more opportunity of observing happenings before the impact. The purport of plaintiff's testimony is that Dr. Smith had left his home and was in his automobile driving from his home westward toward the crossing; that he was traveling in second gear at the rate of twelve to fifteen miles an hour and, without halting or showing any evidence of anything unusual in his progress, had passed practically over the track when the train struck a rear wheel of his car demolishing the car and inflicting injuries which caused death.

The evidence is practically conclusive that a station whistle had been sounded in approaching Lineville. The evidence of the plaintiff is to the effect that no crossing whistle or bell warning was given until the approximate moment of the impact.

The only eye-witness called by the defendant is Harry Gregory, the engineer. The purport of the engineer's evidence is best shown by the following questions and answers:

"Q. You didn't stop at the station at Lineville? A. Oh, no.

"Q. You, of course, were on the right-hand side of the engine as you proceeded north and the tracks there, practically speaking, run north and south? A. Yes, sir.

"Q. You were on the east side of engine? A. Yes, sir.

"Q. I ask you where the automobile with which the engine collided was when you first saw it, if you saw it at all before the collision? A. The first I saw of the automobile was I couldn't tell exactly how far back but I could see a car coming and just, well that would be west of the house on the right-hand side coming toward the track.

"Q. Well, could you give the jury, give the jury your best estimate of how far it was east of the railroad track when you first saw it? A. To my judgment would be around 250 feet, maybe little more.

"Q. Now, where was your engine then with respect to the first crossing south of the crossing where the accident happened and the accident, where the accident happened when you first saw the automobile, was you halfway between those crossings or were you nearer the crossing where the accident occurred? A. Well, I would say we was possibly halfway between, I could tell exactly if I was there but I would say halfway between, possibly.

"Q. Those two crossings? A. Those two crossings.

"Q. And about what speed was your engine moving say at the time you saw the automobile, your best judgment on that? A. Well, I think when I first saw the automobile we was traveling around fifteen miles an hour.

"Q. That's your engine? A. Yes, sir.

"Q. Now, the automobile was coming toward the track when you saw it? A. Yes, sir.

"Q. And did it continue to come on toward the track? A. Yes, it continued to come on in that direction.

"Q. I ask you to tell the jury whether or not the speed of the automobile continued to be about the same or whether it increased or decreased or what happened, how did the automobile travel? A. The automobile came toward the track at—from the time I saw it until it slowed up nearly at the track I think increased the speed a little bit, but it came up within a short distance of the track and apparently stopped, to me it apparently stopped.

"Q. Now, when it stopped or you say apparently stopped, did you then have any reason to think or did you think that the driver of the automobile did not see your train and engine? A. Why, I was satisfied he did see us, looking right at us, looking right that way.

"Q. Was any obstructions to prevent him seeing it from the position he was? A. No, there was nothing to prevent him.

"Q. The driver of the automobile was on what side of the car as he was traveling west? A. He was traveling west, that put him to the south side or left side of the car toward the train.

"Q. This, I believe it's in evidence here without dispute, it was a closed car, coupe? A. Coupe, yes.

"Q. And was the window on the south side of the car or the window next to the driver up or down, I mean was it opened or closed? A. It was open and his elbow was lying in the window.

"Q. His left elbow? A. Yes, sir, lying in the window.

"Q. You say apparently stopped, you thought he stopped for what purpose? A. To let us pass.

"Q. And what was the next thing you observed with respect to the automobile, whether it remained there or what happened? A. The next thing I observed, the automobile shot across or trying to go across ahead of us.

"Q. Then what did you do? A. Immediately on seeing the automobile start up from this stop or apparently stopped position, I applied the brakes in emergency quick as I could.

"Q. Now, was the front of the engine close now to the crossing right close when the automobile shot forward on the crossing? A. Yes, it was right, pretty nearly at the crossing and he didn't shoot

604

straight across, he took an angle to the north or in the general direction we were traveling.

"Q. Now, with respect to any signals that were given, being given at any time, and including the time he drove on to the crossing, tell the jury what the fact is about that. A. The signals that was given?

"Q. Yes, what signals were given, if any, of the train? A. Well, nothing only we was whistling for the crossing."

The evidence of experts offered by the defense is to the effect that it would take approximatly 140 feet to stop the train with safety, when traveling at the rate of eighteen miles per hour.

A number of witnesses, on behalf of the defendant, testified to whistle warning for the Elm Street crossing and to the effect that the bell was kept ringing in the progress of the train through Lineville.

The testimony on behalf of defendant, contradictory to that of the plaintiff, we conclude, need not be more fully set forth for the reason that for the purposes of our review we must consider the evidence from its most favorable point of view for the plaintiff.

Trial was by jury, verdict was for plaintiff in the sum of $4,000; judgment was entered in accordance and defendant has appealed.

OPINION

This accident having occurred in the State of Iowa, parties have stipulated that the Iowa law, as expressed in the decisions as to the issues herein, are invoked.

Defendant in each specification of error so present same as to challenge the application of the doctrine of Last Chance to the issues as presented by the evidence.

In final analysis, defendant's points resolve to; first, demurrer should have been sustained because the evidence was not sufficient to make a submissible case under the Iowa Last Chance doctrine; second, instructions are in error because submitting under the doctrine, and in error, even though the Last Chance doctrine be invoked, because said instructions gave commission to the jury to find for plaintiff on the allegation and proof of negligent acts of defendant, regardless of whether the Last Chance doctrine did or did not apply.

The Last Clear Chance doctrine of Iowa is well set forth in an opinion by the Supreme Court of that state, Lynch et al. v. Des Moines Ry. Co., 245 N. W. 219. In the opinion, the court at l. c. 219 says:

"The doctrine of last fair chance presupposes negligence on the part of the party injured and proceeds upon the theory that notwithstanding this negligence, if the other party, being cognizant of that negligence and of the peril in which the party had placed himself, failed to take the necessary precautions to avoid injuring him, he is liable on the theory that he had a fair chance to avoid the catastrophe

by the use of ordinary care and his failure to exercise it is in such cases the proximate cause of the injury. The doctrine of 'last clear chance' is applicable only if the defendant, or the motorman in the instant case, had actual knowledge of the perilous position of the other party and failed to use due care to avoid the injury which, by the exercise of due care, after acquiring the knowledge, could have been avoided.''

When analyzed, the Iowa and Missouri doctrines are not so divergent as may appear from the abstract statements. While the Missouri doctrine places direct responsibility on opportunity to see and observe, the Iowa doctrine makes issue of fact of knowledge and permits the jury to determine that issue of fact from all the facts and circumstances in evidence.

The defendant cites a long line of both Missouri and Iowa cases dealing with the law as to contributory negligence. There is notably cited Woodard v. Bush, 282 Mo. 163, wherein the old Missouri slogan of ''Stop, Look and Listen'' is discussed. Iowa case cited is Sodemann v. Chicago, M., St. P. & P. R. Co., 244 N. W. 865, where the plaintiff's evidence was contrary to the physical facts and wherein the court held that a motorist, who failed to see or hear the obvious, was guilty of contributory negligence.

Many other cases of similar import are cited, however, we conclude that the negligence of the deceased stands admitted by the presentation of the Last Clear Chance doctrine as it is presented in this case and we see no occasion for further comment on the line of cases cited on the question of contributory negligence.

As to the application of the Last Clear Chance doctrine, an analysis of the testimony of the engineer, Gregory, is very pertinent. The engineer testified that he first say Dr. Smith on his approach to the crossing, after he was west of the first house east of the tracks, and places the distance as 250 feet east of the tracks.

He further testified, when he first saw him, the train was about midway between the Elm Street crossing and the crossing to the south. It is important to the question in hand to know how far south of the Elm Street crossing the engineer was when he first saw the deceased. The defendant placed witnesses on the stand who had made measurements and observations. These witnesses testified that from 172 feet south of Elm Street one on the tracks could see down Elm Street 150 feet. These witnesses further testified that 100 feet South on the tracks gave a vision of 205 feet east of the tracks and from fifty feet south a vision east of 530 feet.

Based upon the defendant's evidence, the engineer would have to have been less than 100 feet of the crossing to see Dr. Smith 250 feet east of the crossing. If such had been the fact, the train at its rate

of speed would have cleared the crossing before Dr. Smith could possibly have arrived there at his rate of speed. We must, therefore, look further into the testimony of the engineer. He further testified:

"The automobile came toward the track at—from the time I saw it until it slowed up nearly at the track I think increased the speed a little bit, but it came up within a short distance of the track and apparently stopped, to me it apparently stopped."

If the above testimony stood alone, it would certainly and strongly support the contention of the defendant. However, we must give to the plaintiff the benefit of the most favorable evidence to the effect that, Dr. Smith with his auto in second gear moved forward at an even rate of speed without halt or stop.

Much is said in defendant's brief touching the knowledge of the engineer. Whatever the position of Dr. Smith as to peril or not of peril, the testimony of the engineer is clearly to the effect that at all times, after he first saw Dr. Smith, he knew of the position of the Doctor. The fact that the Doctor had seemed to him to apparently have stopped and that he glanced to the east to see if others were approaching, does not preclude an issue of fact, as to the engineer's knowledge, being submitted to the jury.

We conclude, therefore, that the Iowa Last Clear Chance doctrine properly presents an issue for the jury to determine, under proper instructions given by the court. Our conclusion is based on the Lynch case, supra which we conclude, is in harmony with all the late decisions of the Iowa Supreme Court.

With our conclusions as stated above, the objections to plaintiff's instruction becomes important. The instructions, especially instruction No. 2, is indeed subject to a criticism often indulged in by appellate courts, wherein we scold and bombard with veiled threats for which no authority can be cited in support of execution thereof. For redundency and verbocity, the instruction is a marvelous example and, still with all, it presents in conjunctive narrative form, with certainty and definite purpose, all that the plaintiff is entitled to, to say the least.

Dehors the record, we feel constrained here to say, that judged by the instructions reviewed by us, there is shown great respect by many lawyers of this state for the sagacity and discerning ability of the jurors of this State.

To a better understanding of our conclusions, we embrace herein the plaintiff's instruction No. 2 complained of by defendant, which is as follows:

"2. The court instructs the jury that under the law of the State of Iowa, by which this case is governed, it was the legal duty of the engine crew of the defendant, Chicago, Rock Island & Pacific Railway

Company, operating trains on its railroad tracks to exercise reasonable care and caution to keep a reasonable watch or lookout on both sides of the railroad track for the personal safety of any person or persons who might be driving in an automobile on, along and over Elm Street crossing in Lineville, Iowa, and to exercise reasonable care and caution for the personal safety of such persons.

''A failure to perform this duty, if you believe from the evidence that there was such failure, is negligence within the meaning of these instructions.

''And, if the jury believe from the evidence that on the 21st day of May, A. D. 1932, Elm Street in Lineville, Iowa, was a duly platted public street and highway, in general public use, and regularly traveled by the general public; and that said Elm Street had been in such use and so traveled for more than ten years prior to May 12, A. D. 1932; and, if the jury further believe from the evidence that said Elm Street crosses the track and right of way of the defendant railway company at a place and point within the limits of the town of Lineville, Iowa, where said Elm Street runs, approximately east and west, and said railroad track runs approximately north and south; and, if the jury further believe from the evidence that on May 12, A. D. 1932, the deceased, Dr. N. A. Smith, was riding westward in a Ford automobile on, along and over said Elm Street and said Elm Street railroad crossing; and, if the jury further believe from the evidence that a northbound engine, tank or tender and caboose operated by the defendant and in the circumstances mentioned in evidence, then and there passed through Lineville; and, if the jury further believe from the evidence that the engineer of said locomotive, tender and caboose did then and there negligently fail to maintain a reasonable watch or lookout for the approach of automobiles at said railroad crossing; and, if the jury further believe from the evidence that the deceased, Dr. N. A. Smith, was riding in said Ford automobile, driving westward at a moderate and uniform rate of speed with the intention and purpose of passing along and over said Elm Street railroad crossing; and if the jury further believe from the evidence that said intention and purpose were plainly apparent to anyone observing said Ford automobile; and, if the jury further believe from the evidence that Dr. N. A. Smith was unaware and unconscious of the approach of said locomotive engine, tender and caboose, and, was in a position of imminent and impending peril and danger of being struck by said locomotive; and, if the jury further believe from the evidence that Dr. N. A. Smith had no knowledge of said peril and danger, if any, and was unaware and unconscious of such peril and danger, if any; and, if the jury further believe from the evidence that after a reasonable time and after a clear opportunity to observe

and see said position of peril and danger, if any, and to observe and see that Dr. N. A. Smith was unaware and unconscious of such peril and danger, if you believe from the evidence that such was the fact, the said engineer by the exercise of ordinary and reasonable care, then and there had the present ability, with the means and appliances then at hand, with safety to said locomotive engine, tender and caboose and the occupants thereof, to prevent said locomotive engine from striking said Ford automobile and said Dr. N. A. Smith; and, if the jury further believe from the evidence that said engineer negligently failed to keep a reasonable lookout and negligently failed to stop, or to slacken and reduce the speed of said locomotive engine; and, if the jury further believe from the evidence that while said locomotive engine was being so run and operated, said locomotive engine struck said Ford automobile and struck said Dr. N. A. Smith, and that thereby he was killed; and, if the jury further believe from the evidence that the acts of said engineer in the running and operation of said locomotive engine, tender and caboose, mentioned in this instruction and in the evidence, were negligent acts, as negligence is defined in these instructions; and, if the jury further believe from the evidence that negligent acts of said engineer as herein mentioned and defined were a direct and proximate cause of the death of said Dr. N. A. Smith then and there was himself careless, or guilty of contributory negligence, then the plaintiff is entitled to recover, and the verdict of the jury must be in favor of the plaintiff.''

The instruction no where predicates a recovery upon a finding by the jury that the engineer had actual knowledge of the perilous position of Dr. Smith. The plaintiff urges that the absence of direct requirement in this respect does not present error, for the reason the testimony of the engineer is, that from a point about 200 feet east of the crossing the engineer saw every movement of the Doctor from that point until he was struck.

Our courts hold that it is unnecessary to prove an admitted fact or to require a finding of such fact by an instruction. [Fledderman v. Manufacturers' Ry. Co., 254 S. W. 717.] [Dincler v. Chicago M. & St. P. Ry. Co., 265 S. W. 113.]

The trouble with plaintiff's position is, that plaintiff in brief and argument presents that the engineer is shown, by his own testimony, to have been so alert and watchful that he saw every movement of Dr. Smith, still plaintiff's instruction asks recovery on the theory that the engineer was negligent in not keeping a proper lookout.

The first paragraph of plaintiff's instruction No. 2 presents abstract principles of law, applicable to negligent cases, wherein in the Last Clear Chance doctrine is not involved and in the second paragraph that law is invoked as the law of this case.

While there is ample evidence in this case to support a verdict of a jury based upon a finding by it that defendant had knowledge, still the case below was not tried by the plaintiff on the theory that the engineer was using due care in matter of keeping proper lookout and plaintiff's attorney in cross-examination of the engineer brought out that his lookout was diverted for the fraction of a minute. In a fraction of a minute much change of situation happens between objects moving at right angles, one moving twenty-nine feet and the other fifteen feet per second, and the question of whether one object, supposedly stopped, starts up also becomes material to the issue as to knowledge.

In a matter of an instruction, the fact of defendant's knowledge cannot be presumed or predicated alone on plaintiff's testimony. The defendant, as to such issue, is entitled to the most favorable inference drawn from defendant's testimony. The engineer testified that he satisfied himself that Dr. Smith had stopped before he diverted his lookout to the east. Under such a state of evidence, an issue of fact is presented in this case as to whether or not the engineer knew of the perilous position of the Doctor in time to have avoided the accident. Instruction No. 2 fails to submit that issue of fact to the jury and permits a recovery on finding that the engineer failed to keep a proper lookout. We conclude, that plaintiff's instruction No. 2 is fatally erroneous. The plaintiff's instruction 3 and 5 partake of the errors in instruction No. 2. Outside of errors in the instruction as stated above, we find no further error that should cause a reversal. The defendant's instructions D-6 and D-7 were properly refused.

For the reasons assigned above, judgment is reversed and cause remanded. All concur.