WALTER GUTTENFELDER, SR., appellee and cross-appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, appellant and cross-appellee.

No. 47974.

(Reported in 52 N.W.2d 50)

756

MARCH 4, 1952.

OPINION MODIFIED AND REHEARING DENIED MAY 9, 1952.

France & France, of Tipton, R. L. Read and A. B. Howland, both of Des Moines, for appellant.

Howard P. Eckerman, of Davenport, and Donnelly, Lynch, Lynch & Dallas, of Cedar Rapids, for appellee.

MANTZ, J.—This action grows out of a collision between an eastbound passenger train of defendant-railway company and an automobile driven by Walter Guttenfelder, Jr., son of plaintiff, in the town of Durant, Iowa, wherein the driver was killed. Plaintiff sued to recover funeral expenses and loss of services of said minor son. The accident happened about 10 a.m. on February 26, 1950, at the intersection of a public street crossing where Calhoun Street of said town crosses the Rock Island tracks.

I.   Plaintiff's petition was in two counts, each based upon

a claim of negligence: (1) In the negligent operation of the train involved, and (2) that the railroad had failed to construct and maintain a good, sufficient and safe crossing as required by law, and also that the railroad was negligent in failing to place sand, cinders or ashes on the roadway at such crossing, which crossing was then covered with hard-packed snow and ice.

Defendant admitted the collision resulting in the death of the minor son; denied any negligence on its part and alleged that deceased was guilty of contributory negligence.

At the conclusion of the evidence, the trial court upon motion of the defendant withdrew from the jury that part of Count II of plaintiff's petition charging that the defendant was negligent in failing to place sand, cinders or ashes on the crossing. The other parts of both counts were submitted to the jury.

A special interrogatory upon the request of the railroad was submitted: "Was the car driven by Walter Guttenfelder Jr. in motion at the time it was struck by defendant's train?" The jury answered the interrogatory "yes." There was a general verdict by the jury in favor of the railway company. The plaintiff moved for a new trial on the grounds that an instruction with respect to the duty of the railway to place sand, gravel or ashes on the crossing was error; also, the court erred in certain rulings on the admission of evidence with respect to the presence of a pile of ashes near the crossing, and certain evidence which tended to impeach one of plaintiff's witnesses by showing that the witness had made statements out of court inconsistent with his testimony.

The court overruled the motion as applied to Count I of plaintiff's petition but sustained it as to Count II on the ground that the giving of instruction 10A with respect to the duty of the railway company as to putting sand or cinders on the crossing was erroneous.

Both parties applied to this court for permission to appeal in advance of judgment. This court gave such permission. These appeals followed.

II. The town of Durant has a population of approximately 1100. It is situated on the double-track main line of the railway company which runs east and west through such town. The railway in passing through the town crosses a number of streets,

including the one in question, Calhoun Street, which is crossed at right angles. The crossing in question has near it the regular upright warning signs. Approximately a block north of the railway tracks and paralleling them through the town is primary highway No. 6, a paved highway running through Iowa. On both sides of said highway where it crosses the streets of Durant there are the official highway stop signs. Calhoun Street had a slight downgrade where it approaches the railway from the south. The railroad tracks had plank approaches on both sides of the rails and the north track was a few inches higher than the south track. There were some mercantile establishments on Calhoun Street on both sides of the crossing. None of these was close enough to obscure the view of the tracks for some distance back from the tracks. At a point 25 feet south of the south track there was an unobstructed view to the west of approximately ¾ of a mile and at a point 43 feet south there was a view of about 600 feet. The south track was for eastbound and the north track for westbound trains. On both tracks the space between the rails was 4 feet 8½ inches and the distance between the two tracks was 8½ feet, making the distance between the two outside rails about 18 feet. The planks on both sides of each rail were 16 feet long, 10 inches wide and 3 inches thick. Between the two inside planks there was a gravel filling.

The Guttenfelders had lived in Durant for a number of years and the father owned a farm near the town. The father and Walter used the Calhoun Street crossing and the father stated that the deceased son crossed over it frequently; also, that the son had driven a car for a number of years. At the time of the accident the son was a student in the Durant High School and was active in school affairs and was a member of the basketball team.

The collision in which Walter Guttenfelder, Jr. was killed took place between 9 and 10 a. m. Sunday morning. Walter was driving a Ford car north on Calhoun Street toward the railway intersection. His car entered Calhoun Street from a side street a block south of the railway crossing. He was alone in the car. The speed of the car was variously estimated by witnesses at from 10 to 15 miles per hour. About the same time an eastbound

train, designated the "Rocket", approached such crossing from the west. Its speed was about 79 miles per hour. An eyewitness who was on Calhoun Street and just north of the intersection testified that he saw the Guttenfelder car coming from the south; that he watched it all the way; that it was not traveling very fast; that the witness heard the whistle of the approaching train and thought that the Guttenfelder car was going to stop; that at a point some 43 feet south of the track the car acted as though its brakes had been applied; the rear end made a sort of a "fish tail" movement; that the car did not stop and kept going ahead and when on the south track was hit by the front of the Diesel engine and carried down the track a distance of several hundred feet. Right after the accident an examination of the street south of the crossing showed that the wheels of the car had slid north to the crossing from a point 43 feet south. The car was a complete wreck. The evidence of the witnesses and the marks on the car indicated that the car was on the south track when hit.

For several days the weather had been quite cold and for two or three of such days the temperature was below zero; snow had been falling at various times and some had fallen a few hours before the accident. It was not drifted but on the streets it was hard packed due to auto and truck travel. There was a creamery close by and the evidence showed that many trucks went over this street to get to the creamery. School buses also used this street and crossing. On the day following and later, pictures were taken of the crossing, the railway tracks, some adjacent buildings and the wrecked car. Some of these were taken by a commercial photographer and on the afternoon of the day following the accident. There was some evidence that the weather was warmer the twenty-seventh and that when the pictures were taken some of the snow and ice had melted at the crossing. We have set out below Exhibits A and B. Exhibit A shows the railway tracks and the crossing looking west. The Guttenfelder car approached the crossing from the south—the left side of the exhibit. Exhibit B shows Calhoun Street and the railroad crossing.

Plaintiff's motion for a new trial was in seven paragraphs. The first deals with a claim that the court erred in the giving of instruction 10A. Inasmuch as the court stated that this instruction was erroneous and based his ruling to set aside the verdict thereon we set it out in full. It is as follows:

"You are instructed that defendant is under no duty to place sand, gravel, cinders or ashes upon its crossings, and that therefore defendant's failure to do so at the Calhoun Street crossing in Durant, Iowa, prior to the collision involved in this action is not a ground of negligence upon which the plaintiff may predicate a recovery."

The other parts of said motion deal with the evidence of the condition of the crossing, its slippery and dangerous condition, the grade of the street and the hard-packed snow thereon, all being an elaboration of the claim of the plaintiff that defendant should have remedied its claimed dangerous condition by the use of sand, gravel, cinders or ashes thereon.

Another part deals to some extent with claimed errors in the admission of testimony and the rulings thereon. Another paragraph makes claim that the court erred in sustaining objections to evidence offered by the plaintiff, all as shown by the reporter's shorthand notes. Nothing specific is pointed out.

The record shows that the plaintiff claimed that the defendant was negligent in failing to put sand, gravel, cinders or ashes on the crossing and introduced evidence to that effect and showed that along the street there was a pile or two of ashes. There was no showing to whom the ashes belonged. Defendant objected to this evidence on the ground that there was no statutory duty on the part of defendant to sand or gravel the crossing. After such testimony was admitted, the court, upon motion of defendant, struck it out. The court also withdrew the specification of negligence, with respect to the absence of ashes, sand or gravel, from the jury as being unsupported. However, the court permitted counsel for plaintiff to refer to such fact to the jury as being "fair comment."

In a memorandum-ruling sustaining the plaintiff's motion for a new trial, the trial court said:

"It seems to me that instruction 10A was too drastic. It should have been qualified as was the instruction given by the

trial court in Adams v. Pennsylvania Railroad Co., 117 Fed. 2d 649. It is true that in that case the Seventh Circuit Court of Appeals held that the question should not have been submitted to the jury at all, because the only defect shown was due to natural accumulation of ice. But here there was something more involved; that is the ten-inch rise in the grade between the north rail of the south track and the south rail of the north track. It was a defect created by the defendant itself. The reasoning in Seybold v. Terre Haute & I. R. Co., an Indiana case found in 46 N.E. 1054, is in point and the factual situation was very similar."

The evidence shows that Calhoun Street and the other streets of Durant at that time had ice thereon and, generally speaking, were covered with packed snow and ice. Roger Drumm, a witness for plaintiff, an eyewitness to the collision, said:

"I had occasion to go over this crossing myself about an hour and a half or so before the collision. I came to Durant from my home which is southwest of town to work at the creamery. I crossed that crossing going from the south to the north. At that time the street was very packed with snow, and slick. *There was hard-packed snow and the crossing surface was the same as the street."*

He further testified that at that time the side streets of Durant were packed with snow and this condition of hard-packed snow on the street and crossing had existed for three or four days before February 26. A Mr. Langmann, postmaster at Durant, a witness for plaintiff, went to the scene of the collision about five to ten minutes after it happened. He testified:

"At that time the roadway was completely covered with snow and snow-packed ice. You couldn't see any of those planks on either side of the road. * * * The crossing at that time looked like a couple of ruts cut through the ice. *The whole surface of the crossing was packed with ice or snow and ice.* All you could see that wasn't ice was where the train wheels had cut through there when the train had passed over the crossing."

This same witness testified as to the weather on the day of the collision and some days before; said there had been snow on several days and that the temperature on February 23 was 24

degrees above zero and on the 24th, 25th and 26th it was 2, 3 and 2 degrees below zero.

Witness was shown Exhibit A, a photograph of the street and crossing, said it was substantially correct except lack of snow and ice on the crossing and a hump between the two tracks. This photograph was taken on the afternoon of February 27. Exhibit B was taken at the same time. Both show the snow condition and the grade at the crossing.

Another witness, a Mr. Jump who lives in Durant, witness for defendant, testified:

"There was a lot of snow and ice and snow on the streets in Durant that Sunday [February 26]. That condition had existed for several days before this. * * * *There was possibly a couple of inches of packed snow in there* [*the crossing*] *when I observed it on Friday.*" The same witness described the crossing: "It isn't perfectly level there. There is an incline up toward the north. The incline starts about 10 inches from the north rail of the south track. * * * The surface of the roadway between the planks was of gravel."

The evidence shows that the space between the two tracks had ten-inch planks on the outside of the two inside rails. The space between the two planks was graveled. The two exhibits show the street and the lay of the surface on either side. An examination shows the grade to the south was gentle and down-hill towards the track. On the day of the accident and for several days prior thereto there was evidence from which the jury could find that the entire crossing between the rails and between the tracks was covered with several inches of packed snow and ice.

It is the claim of defendant-appellant that instruction 10A as given was a correct statement of the law and was not error. We are inclined to think that as far as defendant is concerned this is the principal question in the case.

In the consideration of this case and the issues involved we are to keep in mind the verdict of the jury in favor of the defendant. This was rendered after the trial court instructed the jury on the issues and the matters which must appear before plaintiff could recover. These instructions covered the operation

of the train and the necessity of the defendant to show that the crossing, its building and maintenance complied with the law and that it was safe for ordinary travel. No exception or appeal has been taken from such instructions save as to instruction 10A. Instruction 10A was given at the request of the railway company. Its asking was doubtless prompted by a claim of plaintiff that the defendant was negligent in not placing sand, gravel or ashes thereon and that in the vicinity there were several piles of ashes. This claim and the evidence of such ashes was, upon motion of the defendant, stricken. However, in his argument to the jury the attorney for the plaintiff commented upon the fact that no ashes were placed on the crossing and that same were available. These statements were objected to by the defendant but the court ruled that such were proper. It is to be remembered that the court on its own motion submitted to the jury an interrogatory as to whether decedent's car stopped on the track before the collision and the same was answered in the negative. Also to be kept in mind are some of the matters which inhered in the verdict. The jury was instructed what plaintiff must show and among such things was decedent's freedom from contributory negligence. The jury had before it the evidence as to the type of the crossing existing and its general condition along with the condition of Calhoun Street to the south; the approach of Walter Guttenfelder from the south; his car speed, how it was being driven and its forward movement; the knowledge of the driver of the car as to the crossing; weather conditions, such as snow and ice; the view of the track; the approach of the fast moving train; the warning signals; his driving upon the track; where he was when struck by the engine; and other matters in evidence. Also, and as bearing on the issue of contributory negligence, the finding of the jury on the special interrogatory that at all times the car kept on moving.

Under the provisions of section 478.1, Iowa Code, the railroad company was under a duty to construct and maintain a good, sufficient and safe crossing at the point where its track crossed Calhoun Street in Durant, Iowa. The statutory duty imposed upon the defendant was to keep the highway crossing in a reasonably safe condition and to maintain it in such condition to travel. It would not be bound to make the highway

more safe than highways are usually made and kept for travel. There was no duty resting on the defendant to keep the surface of the road at the crossing so smooth and free from inequalities there would be no jar or jolt caused to vehicles passing over such crossing. Peterson v. Chicago, M. & St. P. Ry. Co., 185 Iowa 378, 170 N.W. 452; Gable v. Kriege, 221 Iowa 852, 267 N.W. 86, 105 A. L. R. 539; Humphrey v. City of Des Moines, 236 Iowa 800, 806, 20 N.W.2d 25, 28. In the last cited case we quoted from the holding of this court in Gable v. Kriege, supra, wherein we said: "A hole or depression of the extent that plaintiffs' testimony shows, three or four inches deep at its deepest point and not abrupt but cupped out by travel, would not render a highway unsafe for travel in the ordinary and reasonable manner of traveling thereon."

The above cited case of Peterson v. Chicago, M. & St. P. Ry. Co., supra, involved an accident wherein the automobile of Peterson was stalled on a crossing over the tracks of the railroad company. While there it was struck by defendant's train. Among the various grounds of negligence was one as follows: "That the defendant failed to maintain a safe highway crossing at the place where the injury occurred; that the crossing planks on either side of the rails were several inches above the level of the highway, and rendered the crossing dangerous and unsafe for one traveling in an automobile; that, as a proximate result of this negligence, his car received a sudden jolt or jar in attempting to cross, which caused the engine to die, and remain on the tracks." (185 Iowa at page 379, 170 N.W. 453.) The court said that negligence presupposes a duty owed to the public generally or a duty owed to the individual complainant. This duty is imposed by the law which provides that every railroad shall construct and maintain at all points where such railway crosses any public road, a good, sufficient and safe crossing.

The court held that under the evidence of plaintiff the crossing complained of met the requirements of the statute and such being the case there was no showing of negligence in regard to such claim of negligence; that under the undisputed evidence it was a question of law for the court.

As to the duty of a railway in regard to construction and maintenance of crossings over public highways, we find that

matter elaborated upon in Gable v. Kriege, supra, 221 Iowa at page 860. There the evidence showed that at the crossing there was a hole or depression three to four inches deep. This court in reviewing the evidence said that such a depression in and of itself does not present a jury question on the issue of negligent maintenance of the crossing. This court (Anderson, J.) reviewed the evidence in considerable detail. There he set out the claim of negligence as urged by plaintiff—a hole or depression in the crossing itself. We quote therefrom:

"As to the alleged defect itself, none of plaintiffs' witnesses testified that the depression was more than 4 inches at its deepest place. It might incidentally be noticed that fifteen or sixteen witnesses of the defendant testified that there was no such hole or depression existing. All of these witnesses except two were disinterested. The photographs which we have referred to show the physical facts to be at variance with the plaintiffs' testimony. A hole or depression of the extent that plaintiffs' testimony shows, three or four inches deep at its deepest point and not abrupt but cupped out by travel, would not render a highway unsafe for travel in the ordinary and reasonable manner of traveling thereon."

The court further stated at page 861, in referring to the case of Peterson v. Chicago, M. & St. P. Ry. Co. (185 Iowa 378):

"And we held that the condition of the crossing as detailed in the foregoing quotation did not establish liability on the part of the railroad company. There is so little difference, if any, in the facts in the Peterson case and in the case at bar that we are constrained to hold that there was no such defect shown in the present case as would make the railway company liable for the accident involved in this case, even though the depression or hole complained of was of the depth and area and location as claimed by plaintiffs."

See also Farley v. Chicago, R. I. & P. R. Co., 42 Iowa 234; Beatty v. Central Iowa R. Co., 58 Iowa 242, 12 N.W. 332; City of Bloomington v. Illinois Cent. Ry. Co., 154 Ill. 539, 39 N.E. 478.

Walter Guttenfelder Sr. was shown various pictures of the car which figured in the collision—one of the car before the

wreck and four others after. As a witness he described an indentation of the letters "R" and "O" on the top of the car and just over the jamb post. He thinks these letters were caused by the Rock Island insignia on the locomotive front. One of the photographs of plaintiff (Exhibit 9) shows a Ford car which witness says is an exact duplicate of the one driven by his son when killed. We do not find the over-all length given in the record, but by judging from the distance the rear of the front axle and the projections behind each axle we conclude that the length of the Ford was approximately 16 feet. Exhibit No. 9 shows a jamb post in what appears to be its center. Witness says that from the jamb post to the front axle is 6 feet 7 inches and from said post to the rear end is 3 feet. This would make the distance from the front axle to the rear approximately 9 feet 7 inches. An examination of this exhibit shows that it is farther from the rear axle to the rear end than from the front axle to the front end. At least two eyewitnesses said the engine hit the car squarely when it was on the south tracks, and the physical facts, including the length of the car, show that when hit the rear wheels were just south of or were coming to the south rail. From the south rail of the south track to the south rail of the north track was approximately 13½ feet. According to the physical facts the front wheels of the car when hit could not have been more than 2 feet north of the north rail of the south track.

There was uncontradicted evidence that an examination of the crossing right after the accident showed that all of the planks and the spaces between the rails and between the tracks were completely covered with ice and hard-packed snow. Such snow and ice was not bumpy or in ruts and was hard and packed by vehicular travel.

While some of the cases heretofore cited are not directly applicable to the issue herein, still we think they are analogous in that they set forth and refer to some of the rules which are applied in cases involving street accidents, those at crossings, and conditions which may exist at such times—weather and matters not under usual and ordinary control. Humphrey v. City of Des Moines, supra.

In the instant case there was the weather element—

wintry, zero weather—hard-packed snow and ice on highway and street; surfaces—the evidence was that there was hard-packed snow and ice. There is no evidence in the record that the street from the south or the railway crossing over which deceased was driving had a surface that was ridged, rough or uneven. It was simply slippery by reason of conditions which were not man-made or controlled. The street to the south and up to the south edge of the crossing was under the control of the town of Durant. Nothing by way of sand or ashes had been applied to its surface. It can hardly be argued that there is a legal obligation upon a town, city or railway company to remove a natural accumulation of ice and snow from a street. Ritchie v. City of Des Moines, 211 Iowa 1026, 233 N.W. 43. In Sankey v. Chicago, R. I. & P. Ry. Co., 118 Iowa 39, 43, 91 N.W. 820, 821, the matter directly involved was the claim of plaintiff that the railway company was negligent in failing to remove snow and ice from its switching tracks. It was there stated that there existed a duty upon a municipal corporation to see that snow and ice in uneven and irregular masses did not accumulate and remain upon the streets. (Citing Collins v. City of Council Bluffs, 32 Iowa 324, 7 Am. Rep. 200; Huston v. City of Council Bluffs, 101 Iowa 33, 69 N.W. 1130, 36 L. R. A. 211.) The opinion further says that "no such duty exists while the snow and ice remain unchanged by the interference of man or other artificial cause. That duty arises only when by reason of such interference with natural conditions the snow or ice becomes ridged or rounded or uneven, or is made to assume some other form or present some other danger than would result solely from natural causes." (Citing Huston v. City of Council Bluffs, supra; Broburg v. City of Des Moines, 63 Iowa 523, 19 N.W. 340, 50 Am. Rep. 756.) Such case further holds that the general principles as set forth in the cited cases are applicable to railway companies in respect to the care of their yards and tracks. See Staples v. City of Spencer, 222 Iowa 1241, 1244, 1246, 271 N.W. 200.

Harris v. Chicago, M., St. P. & P. R. Co., Mitchell, J., 224 Iowa 1319, 278 N.W. 338, was a crossing case where a passenger in a car was jolted while driving over a viaduct at Madrid, Iowa. The trial court submitted the case to the jury—verdict for plaintiff. The railroad appealed. Plaintiff's claim was that the cross-

ing was unsafe. In its opinion the court quoted from the case of Peterson v. Chicago, M. & St. P. Ry. Co., 185 Iowa 378 (that case followed by Gable v. Kriege, 221 Iowa 852). In the Harris case the court held that the burden of showing that the viaduct was not suitable for the conditions that existed at the time of the accident rested upon the plaintiff-appellee. Further, at page 1323 of 224 Iowa, we said: "It is not sufficient for appellee simply to show that the accident occurred upon the street or viaduct in controversy. She must go further and prove that it was caused by the negligence of the appellants." Again, "There is no legal principle better settled than this, that a verdict may not rest upon surmise, speculation, or guess. See Wilson v. Illinois Central Railway Co., 150 Iowa 33, 129 N.W. 340, 34 L. R. A. (N. S.) 687."

The rather recent case of Humphrey v. City of Des Moines, supra, was one in which plaintiff was injured as a result of an automobile accident. His petition alleged that the accident was caused by a defect in the pavement of a street in Des Moines and alleged that the city was negligent in not keeping said highway in a safe condition for travel pursuant to section 5945, Code, 1939 (now section 389.12, Code, 1950). The trial court directed a verdict for defendant. This was affirmed on appeal. In the opinion (page 804 of 236 Iowa) it was stated that the plaintiff-appellant relied upon cases from this court which had interpreted said statute, which provides that cities "shall have the care, supervision, and control of all public highways, streets, avenues, alleys, public squares, and commons within the city, and shall cause the same to be kept open and in repair and free from nuisances."

The court then quotes from various Iowa cases, Abraham v. City of Sioux City, 218 Iowa 1068; 250 N.W. 461; Johnson v. City of Ames, 181 Iowa 65, 162 N.W. 858, and in the latter quoted at some length from the case of Keen v. City of Mitchell, 37 S. D. 247, 157 N.W. 1049, L. R. A. 1916F 704.

In the Abraham case, supra, the Iowa court held that the city had the care and control of city streets and had a duty to keep them open and free from nuisances; that in so doing it must exercise reasonable and ordinary care to keep its streets in safe condition for usual and ordinary travel but was not re-

quired to keep them in a condition of absolute safety, nor is it an insurer of the safety of travelers upon its streets, nor is it required to foresee and provide against every possible accident.

The foregoing was set out and approved in the Johnson case; also the Keen case from South Dakota. The Humphrey case thereupon sets forth two cases and says that these are sufficiently analogous to sustain the conclusion reached. The two cases cited are Peterson v. Chicago, M. & St. P. Ry. Co. and Gable v. Kriege, both supra.

Instruction 10A, which the trial court held was error, has been heretofore set forth. The trial court held that it was too drastic and should have been qualified in that there was evidence that there was a raise of approximately 10 inches between the north and south tracks. The evidence and the exhibits show that if there were any such raises or hump in the crossing they were completely covered by packed snow and ice and had a uniformly rounded surface. There were no ruts, ridges or uneven surfaces. Certainly there can be no valid claim sustained by authority that the railway company was under a legal duty to place sand, cinders or ashes upon the crossing. No authority has been cited which holds that a failure to do so is negligence. Appellee has cited various cases dealing with the duty of cities and towns to make travel safe on streets, crossings or sidewalks. No such duty rests upon a municipality in regard to street travel. They are required simply to keep them open for travel and free from nuisance. This court has held that the principles and rules as to the care of streets are likewise applicable to railway companies. Sankey v. Chicago, R. I. & P. Ry. Co. and Farley v. Chicago, R. I. & P. R. Co., 42 Iowa 234, both supra. The opinion in the Sankey case was by Justice Weaver, and in it he discussed numerous cases dealing with the degree of care required of a municipality or a railroad as to making the streets of a city and the tracks of a railway company free from danger. On page 42 (118 Iowa) the opinion deals with ice and snow conditions upon streets. It dealt with the claim of plaintiff's attorney that a city is bound to remove snow and ice from its sidewalks. The opinion states, "It is not correct that cities are 'bound to remove snow and ice from their sidewalks.'" (Page 43) Further,

it is stated no such duty exists while the snow and ice remain unchanged by the interference of man or other artificial causes. Speaking further as contrasting such duty and that of a railroad company the opinion states: "That the general principle controlling the cases referred to may, under proper circumstances, be applicable to railway companies, in respect to their care for yards and tracks where trainmen are expected to work, has repeatedly been held; and no court, so far as we have been able to discover, has held to the contrary." The Farley case above-cited simply holds that it is the duty of a railroad to erect a crossing which will comply with the statute.

Appellee has cited various cases concerning the care of walks and crosswalks, also cattle crossings. We do not think that they are applicable here and the language used must be considered in connection with the facts of the particular cases. No contention is made that the crossing at the Durant street was not structurally correct. The fact that the north rails were a few inches above the south rails could hardly be applicable here for the record shows without dispute that the Guttenfelder car was hit when on the south track and several feet from the rail of the north tracks. It had not reached the point where any raise existed. In regard to the claim of there being a hump between the set of tracks, the evidence shows that at that time the entire crossing on each side between the rails and between the two tracks was a solid and slippery mass of hard-packed snow and ice and that it had been in that condition for several days. The exhibits set out herein show the nature of such crossing.

It is somewhat interesting to note the change of plaintiff's petition herein and that taken in the trial of the case. In the trial the principal emphasis was placed upon the failure of the railway company to place sand, ashes, etc. on the crossing in that it was at the time of the accident covered by packed snow and ice. When instruction 10A was given, plaintiff excepted in the following:

"The facts are such that the jury would be warranted in finding that the construction of the crossing was such that the defect was aggravated by the presence of hard-packed snow thereon, and that such circumstances were of a character that

in the exercise of reasonable care defendant would have had a duty to place sand, gravel, cinders or ashes upon this crossing."

It will be noted that this was after the court had stricken from the record pleading and evidence as to the sand, ashes, etc.

Plaintiff-appellee simply argues herein that if the crossing was slippery due to packed snow and ice the hazard should have been lessened by the application of sand, ashes, etc. if the same was available. We are referred to no authority to sustain such claim.

Plaintiff in effect argues that it was a matter for the jury to find whether or not the railway company should have applied sand, gravel, etc. on the crossing. In support plaintiff sets out three cases: Staples v. City of Spencer, 222 Iowa 1241, 271 N.W. 200, Ritchie v. City of Des Moines, 211 Iowa 1026, 1033, 233 N.W. 43, 47, and Bahner v. City of Des Moines, 230 Iowa 13, 296 N.W. 728. In the Ritchie case the plaintiff fell on a street where there was a coating of snow covered by ice. She claimed that the city was negligent in not removing the snow and ice. There was a verdict for plaintiff. On appeal there was a reversal. The writer of the opinion (Justice Evans) made a careful and clear analysis of many cases dealing with the liability of municipalities for injuries suffered by reason of claimed defects in walks, crosswalks and streets. He discussed the heavy fall of snow and ice and the impossibility and impracticability of dealing with such at all times. The holding therein was that no such duty was imposed. We quote from the opinion as to the *duty* to remove snow from the streets: "There is a quality of absurdity in saying that the city should remove the snow from the streets *before* it becomes trampled and packed." (Citing Broburg v. City of Des Moines, 63 Iowa 523, 19 N.W. 340, 50 Am. Rep. 756; Beardmore v. New Albin, 203 Iowa 721, 211 N.W. 430; Tollackson v. City of Eagle Grove, 203 Iowa 696, 213 N.W. 222.)

In Staples v. City of Spencer, supra, the court allowed recovery where plaintiff was injured at a *crosswalk* where ruts were allowed to accumulate after several days of heavy travel. One of the specifications of negligence urged against the city was " '5. That the city was negligent because it failed to put on the ice any sand or cinders or other substance which would

prevent pedestrians from slipping and falling thereon.'" (At page 1243 of 222 Iowa.)

Plaintiff was injured at a street crosswalk. The city contended that there was no duty upon it to sand slippery crossings. In answering this claim this court said at page 1247:

"We think counsel has overlooked one of the fundamental principles of the law of negligence, namely, the duty to use reasonable care in keeping the *crossing* in a safe condition and to do this the city certainly was required to use any feasible or practical means at hand. Certainly the city officials, with sand and gravel at hand available for the very purpose of using the same to render slippery and icy *crossings* less hazardous, could not sit idly by and do nothing under such circumstances." (Italics for emphasis.)

Immediately following the part above-quoted this court went on to say: "Now, we do not want to be understood as holding that a city is duty bound to keep on hand sand and gravel or that there is at all times and under all circumstances any duty upon a city or town to sand or/and gravel icy *crossings* \* \* \*." We note the court was dealing with a crosswalk, not the street itself.

In Bahner v. Des Moines, 230 Iowa 13, 15, 296 N.W. 728, 729, a passenger in an automobile operated upon a street struck a hole in the street, the hole being the result of snow and ice. Among the grounds of negligence urged against the defendant was "'(e) In failing to keep East 24th Street free from a nuisance which interfered with ordinary public travel.'" The automobile struck the hole injuring plaintiff. The hole was caused by vehicular travel in the snow and ice. The court directed a verdict for the city. This court affirmed the ruling and in doing so reviewed many Iowa cases dealing with the duties of cities and towns to make walks and crossings free from defects. Ritchie v. City of Des Moines, supra. It referred to Staples v. City of Spencer, supra, wherein there was language used as to the duty of the city of Spencer to use sand or gravel at a crosswalk and quoting therefrom what this court stated on that point. Following this we said at page 21 of 230 Iowa: "The holding in the above case is clearly distinguishable. There the evidence sup-

ported a finding that the suggested remedy was possible and practicable."

We have examined the two cases cited by the trial court in his ruling granting a new trial. In the case of Seybold v. Terre Haute & I. R. Co., 18 Ind. App. 367, 46 N.E. 1054, a wagon slid off an approach to the railroad. We do not think the language of the Indiana court has application to the issues in the instant case. In Adams v. Pennsylvania R. Co., 7 Cir., Ind., 117 F.2d 649, the Federal Circuit Court reversed the Federal District Court because of an instruction to the jury that the railroad was under an obligation to place sand or gravel on the crossing if ordinary care required. The Circuit Court stated that under the Indiana law there was no greater duty imposed upon a railroad in that respect than upon a municipality and that the instruction was erroneous.

We are of the opinion that instruction 10A was a correct statement of the law in reference to the matter set forth therein. In addition we find it difficult to see wherein it was prejudicial to plaintiff.

III. We will next consider the plaintiff's cross-appeal, which urged that the trial court erred in two particulars:

(1) In the admission, over plaintiff's objection in connection with the cross-examination of plaintiff's witness Roger Drumm, questions asked and answers given by the witness at the previous coroner's inquest.

(2) The court erred in refusing to grant plaintiff a new trial on Count I of his petition for the reason that the errors relative to placing sand or ashes upon the crossing may have affected the verdict as to Count I.

It is to be kept in mind that the trial court granted plaintiff a new trial on the ground that instruction 10A was error, but refused to reverse on Count I of plaintiff's petition. In the ruling the court held that the jury's verdict as far as Count I was concerned should stand in the event there was a retrial.

Roger Drumm was an eyewitness to the collision. Following this he later gave a statement to an agent for the railroad company in which he told what he had observed; that he heard the whistle of the oncoming train; saw the Guttenfelder car as it approached; told how the car acted; thought it was

going to stop; and the collision which followed. Plaintiff called him as a witness. He gave testimony somewhat at variance with the statement (Exhibit C).

Plaintiff had contended that the oncoming engine did not sound a warning whistle. The evidence on that point was in dispute. There was positive evidence that it was sounded. Some witnesses say that they did not hear it; others that it was not sounded. Drumm gave testimony at the coroner's inquest that he believed that the whistle was sounded and he further stated that he believed that a person could have heard the whistle in time. This was elicited on cross-examination over the objection of plaintiff. We think the question was proper. See State v. Matheson, 130 Iowa 440, 103 N.W. 137, 114 Am. St. Rep. 427, 8 Ann. Cas. 430; Olson v. Hodges, 236 Iowa 612, 19 N.W.2d 676; State v. Criswell, 148 Iowa 254, 127 N.W. 65. On cross-examination he was asked:

"Isn't it true, Mr. Drumm, that you heard several blasts of the whistle sounding as the automobile made the turn and came down towards the north? A. Well, it would be the usual sound of the train. Those trains go through every day and you never pay much attention any more after you hear one, and that's just about all you are conscious of hearing. I didn't hear the rumble and roar of that train before I heard the whistle."

In the statement (Exhibit C-1) which he gave three days after the accident we find the following:

" 'I would say that the warnings or whistles of the train were carried out in the normal manner from the time he first started to blow and would also say that the engineer or fireman did a good job of blowing this whistle.' Q. Was that in there when you signed it? A. Yes."

We think the cross-examinations were proper. Eggermont v. Central Surety & Ins. Corp., 238 Iowa 28, 24 N.W.2d 809. See cases set forth in annotation in 66 A. L. R. 289 and 158 A. L. R. 823.

The second claimed error urged by plaintiff on his cross-appeal, and set forth, is that the trial court refused to give a new trial on Count I of the petition. In substance it is that the

court's error in dealing with the sand, gravel and cinders on the crossing "may have affected the verdict as to Count I." In effect he argues that Walter Guttenfelder had a right to assume as he approached the crossing that the railway had placed sand and ashes upon such crossing so that the driver of the car would be protected, and this as bearing on the claim of the railway company that the driver was then and there guilty of contributory negligence. It is hardly necessary to cite authority that a driver cannot close his eyes to a situation where perils are obvious. He was traveling on a street that was icy and slippery from packed snow and ice. He had traveled Calhoun Street and gone over the crossing many times. When he approached the tracks he was driving in the face of known danger. He must have known of the trains, their speed and frequency. He was going down a slight grade and did not stop or slow down to any appreciable extent. The trial court set forth the duty of the driver to exercise ordinary care for his own safety and we think fully and correctly covered that phase of the issue in the instructions. It is quite difficult to see wherein this could have influenced or affected the verdict of the jury. It seems to us that there was ample evidence in the record upon which the jury could have found that the driver of the approaching car was negligent. We find no error as claimed by plaintiff.

It is our conclusion that the court erred in setting aside the verdict by holding that instruction 10A was erroneous; that no error was committed in refusing to set aside the jury's finding on Count I. The case is reversed for judgment on the verdict. —Reversed on appeal of the railway company; affirmed on the cross-appeal.

Smith, Wennerstrum and Hays, JJ., concur.

Bliss and Mulroney, JJ., concur in result.

Oliver and Garfield, JJ., dissent.

Thompson, C. J., takes no part.